REVISED, January 24, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-60679
_____

W H SCOTT CONSTRUCTION COMPANY, INC

Plaintiff-Appellee

v.

CITY OF JACKSON, MISSISSIPPI; HARVEY JOHNSON, In his official
capacity as Mayor of the city of Jackson, MS; LOUIS E ARMSTRONG,
In his official capacity as a present member of the Jackson City
Council; MARGARET BARRETT, In her official capacity as a present
member of the Jackson City Council; CHIP RENO, In his official
capacity as a present member of the Jackson City Council; KENNETH
STOKES, In his official capacity as a present member of the
Jackson City Council; WILLIAM BROWN, In his official capacity as
a member of the Jackson City Council; ROBERT WILLIAMS, In his
official capacity as a present member of the Jackson City
Council; BEN ALLEN, In his official capacity as a present member
of the Jackson City Council

Defendants-Appellants

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____
December 23, 1999

Before KING, Chief Judge, and REYNALDO G. GARZA and EMILIO M.
GARZA, Circuit Judges.

KING, Chief Judge:

Defendants-Appellants City of Jackson, Mississippi, et al.,

appeal the district court's grant of summary judgment to

Plaintiff-Appellee W.H. Scott Construction Company, Inc., in

1

Plaintiff-Appellee's equal protection challenge to a policy encouraging minority participation in city construction contracts.  We affirm.

I.

In 1985, the City of Jackson (the "City") adopted a Minority Business Enterprise Program ("MBE Program" or the "Program"). The Program, designed to remedy the effects of past discrimination, established a "goals" program for the utilization of minority-owned businesses ("MBEs"), as well as those owned by women ("WBEs"), in City contracts.[1]  The Program was managed by the City's Office of Business Development ("OBD").  Initially, the minority-participation goal was 5% of all City contracts, relative to the overall City budget, including contracts for goods, services, and construction.  Later the goal was increased to 15%.  The Program's Liaison Officer within the OBD was charged with, among other duties, "[c]oordinat[ing] procurement activities with each City department head to ensure that the maximum amount of dollars and contracts are afforded to minority firms."

Prior to implementing the Program and the original 5% goal, the City established an advisory committee of local businesses and conducted a series of hearings to document discrimination against minority business owners.  The 5% goal, however, was not

_____

[1]Although the Program, as well as the other City initiatives referenced infra, established goals for the utilization of WBEs, these goals are not specifically at issue in this case. Therefore, we will not focus on them in our discussion.

2

based on any objective data.  According to Willie Cole, manager of the OBD, it was a "guess" that was adopted because the City "felt like there was at least enough minority business out there to do five percent of business to the City of Jackson."  The goal was later increased to 15% because it was found that 10% of businesses in Mississippi were minority-owned.  The 15% goal applied to all areas of procurement.

After the Program's adoption, the City's Department of Public Works (the "Department") began submitting reports of its contracting activities to the OBD.  In 1988, the Department established its own policy for the use of the City's goals.  The Department began including a "Special Notice to Bidders No. 1" (the "Special Notice") as part of the specifications for all City construction contracts.  The Special Notice encouraged prime construction contractors to include in their bids 15% participation by subcontractors certified as Disadvantaged Business Enterprises ("DBEs") and 5% participation by those certified as WBEs.  The Department implemented these goals to effectuate its policy as stated in the Special Notice:

> It is the policy of the City of Jackson Department of Public Works (DPW) that small business concerns (DBE/WBE)...shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with City funds.  The Minority Business Enterprise Program will be implemented in such manner that participation of minorities and women will be equitably distributed throughout the construction industry.

A prime contractor could, however, support a lack of such participation with a showing of good-faith efforts to meet the

goals.

The Special Notice defined a DBE as "[a] small business concern which is owned and controlled by socially and economically disadvantaged individuals."  In turn, "[t]he term 'socially and economically disadvantaged individuals' has the meaning such term has under Section 8(d) of the Small Business Act (15 U.S.C. § 637(d)) and relevant subcontracting regulations promulgated pursuant thereto."  The Small Business Act ("SBA") defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. § 637(a)(5). Economically disadvantaged individuals are defined as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged."  15 U.S.C. § 637(a)(6)(A).  Section 8(d) of the SBA pertains to eligibility for disadvantaged status under subcontracting provisions like the one at issue in the Special Notice.  It states that prime contractors are to "presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act."  15 U.S.C. § 637(d)(3)(C).  Therefore,

4

Sections 8(d) and 8(a) are both implicated in a determination of disadvantage.

In 1991, the Mississippi legislature passed a bill that would allow cities to set aside 20% of procurement for minority businesses.  According to an affidavit submitted by Willie Cole, the Jackson City Council voted to implement the set-aside, contingent on the City's adoption of a disparity study conducted pursuant to City of Richmond v. J.A. Croson, Co., 488 U.S. 469 (1989).  Cole stated that he drafted "The Minority Business Development Division Policy Document" (the "Policy Document") in 1993 for the OBD to use as a guide until such disparity study could be conducted.  The Policy Document was based on research from other cities and reiterated the goal of 15% minority participation in the City's contracts.

The City finally retained a company to conduct a disparity study in 1994.  The study analyzed the City's contracting activities within the Department of Public Works, as well as those within other City government departments, and concluded that the total underutilization of African-American- and Asian-American-owned firms was statistically significant.  The study recommended that the City implement a range of MBE goals from 10-15%, depending on the trade at issue.  The City, however, was not satisfied with the study and chose not to adopt its conclusions.  Instead, the City retained its 15% MBE goal while it searched for another company to conduct a disparity study.  Without adoption of the study, the City never implemented the 20% set-aside

5

authorized by the state legislature.

In June 1997, the City advertised for the construction of the Thalia Mara Hall toilet expansion project (the "Project") through its Department of Public Works. The Department included its Special Notice in the Project's specifications. Sealed bids were opened on July 22, and Plaintiff-Appellee W.H. Scott Construction Company, Inc. ("Scott") was the lowest bidder. On July 23, Scott informed the Department of its "attempt[s] to secure DBE participation" in subcontracting for the Project, including advertisements stating that it was "requesting bids from qualified MBEs/WBEs...." Although Scott managed to get 11.5% WBE participation, it reported that the bids from DBE subcontractors had not been low bids and that, therefore, its DBE-participation percentage would be only 1%. The Director of the Department encouraged Scott to "employ a minority vendor" from whom to purchase materials in order to meet the goal.

Despite Scott's failure to meet the DBE goal, on July 28, the Department drafted a memorandum to Mayor Harvey Johnson (the "Mayor") recommending approval of the Scott bid. The memorandum noted that the Scott bid exceeded the established budget for the 1996-97 fiscal year by $33,600 and that Scott had proposed a 1% minority-participation rate. Three weeks later, Scott wrote to the Department that it would not consider the Department's suggestions for increasing its minority participation. Scott sent a copy of the letter to the Mayor. The Department and the Mayor, as well as the City's finance and legal departments,

6

approved Scott's bid anyway, and it was then placed on the City Council's agenda.

On September 2, the City Council voted against the Scott bid without comment. The vote was 4-3, with all of the African-American Council members voting against Scott and all of the white Council members voting for Scott. After the vote, Scott's president contacted City Council member Louis Armstrong to find out why the bid was rejected. An argument ensued, and Armstrong stated, "We have been left out of the process for 400 years, we're going to do what we have to do." The City alleges that the Scott bid was rejected because it exceeded the budget established for the Project, not because Scott failed to reach the DBE participation goal.

The City subsequently combined the toilet work at Thalia Mara Hall with a renovation project, adding to the specifications and increasing the estimated cost of the project from approximately $200,000 to between $300,000 and $350,000. On December 16, 1997, the City Council awarded the combined project to Arcon Construction Company. At that meeting, Armstrong and the Mayor explained that the Scott bid had been rejected because it exceeded the amount allocated to the original Project from the City's 1996-97 funds. The City, they said, had decided to expand the project, using funds allocated for the 1997-98 fiscal year, in hopes of getting a better price.

Scott maintained that rejection of its bid was racially motivated, and it filed the instant suit. In its complaint,

7

Scott alleged that the City's minority-participation policy (the "Policy"), as implemented through the Special Notice, discriminated against nonminority contractors.  Scott sought a declaratory judgment holding the Special Notice unconstitutional under the Equal Protection Clause, a permanent injunction enjoining the City from enforcing its Policy, and compensatory damages.  Both Scott and the City filed motions for summary judgment.  Scott, having become aware of the City's Program and Policy Document during discovery, expanded its challenge to include them as part of the relevant Policy.

The district court granted Scott's motion.  It agreed with Scott that the relevant Policy included not just the Special Notice issued by the Department of Public Works, but that it also included the Program and Policy Document, which were issued by the OBD and applied to all City contracts.  The district court concluded first that, under <u>Northeastern Florida Chapter of the Associated General Contractors of America, et al. v. City of Jacksonville</u>, 508 U.S. 656, 666 (1993), Scott had standing to challenge the Policy, regardless of whether its bid was rejected because of the Policy or because the bid was over budget.  The court then found that the Policy was unconstitutional because, under <u>City of Richmond v. J.A. Croson, Co.</u>, 488 U.S. 469 (1989), the Policy lacked the requisite findings to justify its 15% minority-participation goal and survive strict scrutiny.  It should be noted, however, that the district court restricted its final judgment to striking minority-participation goals for the

8

City's construction contracts only.

Thereafter, the court conducted an evidentiary hearing on the issues of causation and damages. At the conclusion of the hearing, the court rendered a bench opinion, which included its findings of fact and conclusions of law. The court found that Scott's bid was rejected because Scott lacked sufficient minority participation, not because it exceeded the City's budget. Further, the court awarded Scott $11,643 for lost profits. The City now appeals.

## II.

We review the grant of summary judgment de novo, applying the same criteria used by the district court in the first instance. See Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994); Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994). After consulting applicable law to ascertain the material factual issues, we consider the evidence bearing on those issues, viewing the facts and inferences to be drawn therefrom in the light most favorable to the non-movant. See King v. Chide, 974 F.2d 653, 655-56 (5th Cir. 1992). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

With respect to the district court's bench opinion, we review the court's findings of fact for clear error; its

9

conclusions of law are reviewable de novo.  See <u>Sepulvado v. CSC</u>
<u>Credit Serv., Inc.,</u> 158 F.3d 890, 895 (5th Cir. 1998).

III.

On appeal, the City contests both the district court's grant
of summary judgment, as well as the court's findings in its bench
opinion.  We address each issue in turn.

**A.  Summary Judgment**

1.  Standing

In <u>Northeastern Florida</u>, 508 U.S. at 666, the United States
Supreme Court held that, for standing purposes, "a party
challenging a set-aside program...need only demonstrate that it
is able and ready to bid on contracts and that a discriminatory
policy prevents it from doing so on an equal basis."  The
district court found that the City's Policy placed minority and
nonminority businesses on unequal footing and, thus concluded
that Scott had standing.  We agree that Scott has standing, but,
before addressing the district court's conclusions, we must first
clarify the scope of those conclusions.

The district court began its analysis on standing by
defining the challenged Policy as including the Department's
Special Notice, as well as the City's Program and Policy
Document.  The City maintains that the district court should have
limited its analysis to the Special Notice.  We need not decide
whether the district court should have so limited its analysis,
because even if we assume, <u>arguendo</u>, that the analysis should
have been so limited, Scott nevertheless prevails.

10

The OBD manages the City's Program pursuant to internal guidelines set forth in its own Policy Document. The OBD's task in administering the Program is to effect strategies encouraging minority participation in all contracts that the City lets, whether through the Department of Public Works or other City departments, for the City's goods, services and construction projects.[2] The Department of Public Works is the department responsible for letting construction contracts, and it adopted its own policy for doing so--the Special Notice.

The foregoing is relevant to a discussion of standing because Scott does not have standing to challenge programs relating to every contract let by the City. It is "able and ready to bid," within the meaning of Northeastern Florida, 508 U.S. at 666, only on construction contracts. See Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia, 6 F.3d 990, 997-98 (3rd Cir. 1993) (restricting construction contractors' standing to challenge city ordinance, which established city-wide DBE participation goals, to standing to challenge ordinance's construction provisions, because "the Contractors only have a personal interest in obtaining construction contracts" that they are "ready and able" to bid on (internal quotations omitted)). Indeed, the only evidence

_____

[2]These strategies are not limited to examining past procurement activity and setting minority-participation goals accordingly. The Program also includes strategies for developing networks between minority businesses and the public/private sector, and providing technical assistance and training sessions for minority businesses.

11

presented in this case, and the focus of the district court's discussion, involved the participation of minority subcontractors in construction contracts and the impact of the 15% goal on Scott's ability to compete in the construction industry[3]; no evidence was offered on the contracting activities or Program implementation in other City departments. See id. at 998-99 ("Accordingly, no evidence has been presented on other areas of City contracting. To consider application of the Ordinance to these contracts without the benefit of the adversary process would require us to proceed without 'data relevant and adequate to an informed judgment.'"(quoting New York v. Ferber, 458 U.S. 747, 768 (1982))). We recognize that the Program is specifically referenced in the Special Notice. For purposes of this opinion, however, our focus is the manner in which, and the extent to which, the Department's implementation of the Program was enforced. Therefore, we restrict our analysis to the Department's Special Notice.

Such restriction does not, however, alter the outcome of the district court's opinion. As noted above, the district court's final judgment restricted its holding to goal-oriented programs

---

[3]In its brief, even Scott focuses our inquiry on this narrow issue. It begins its argument by stating that "Scott challenged the City's policy of establishing a 'goal' of minority participation of subcontractors in construction contracts awarded by the City .... The City argues that the District Court erred in granting summary judgment to Scott and declaring the City's policy unconstitutional."

12

that affect City construction contracts.[4]  Thus, even though the City avers that summary judgment was improper because there was a question of fact as to what Policy was at issue, the question does not affect the scope of the outcome.

The City contends, however, that Scott does not have standing to challenge the Special Notice because Scott failed to meet its threshold burden of proving that it was unable to bid on construction contracts "on an equal basis."  Northeastern Florida, 508 U.S. at 666.  Specifically, the City avers that the Department's Special Notice does not disadvantage nonminority contractors because it neither makes bidding for contracts more difficult for nonminority contractors, nor does it impair nonminority contractors' ability to be awarded those contracts.  Usually, the City observes, if a nonminority contractor has the low bid, it will receive the contract even though its bid might lack minority participation and other bids include minority participation.  The City notes that Scott itself has received six contracts since the Special Notice took effect, despite its failure in each case to garner 15% minority participation.  The City argues further that minority and nonminority contractors compete on an equal basis because the Special Notice applies equally to minority and nonminority contractors.

In order to have standing, Scott must demonstrate:  (1) an

---

[4]In its "Conclusion," the district court states, "The City of Jackson Policy establishing goals of 15% minority subcontractor participation in all City construction contracts violates the 14th Amendment."

13

"injury in fact," meaning the "invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct," meaning that the "injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision," meaning that "the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative." Northeastern Florida, 508 U.S. at 663-64 (internal quotations and citations omitted).

In equal protection cases challenging affirmative action policies, "injury in fact" is defined as "the inability to compete on an equal footing in the bidding process." Id. at 666. The City's arguments are unavailing under this standard. For Scott's injury to be concrete and particularized, it need not prove that it lost contracts because of the Department's Policy; Scott need only prove that the Special Notice forces it to compete on an unequal basis. See id. ("The 'injury in fact'...is the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain the benefit."). The question, therefore, is whether the Special Notice imposes an obligation that is borne unequally by DBE contractors and non-DBE

14

contractors.[5]

Contrary to the City's assertions, the inconsistency with which the obligation is enforced is irrelevant, because it has not negated the existence of the obligation. If a non-DBE contractor is unable to procure 15% DBE participation, it must still "satisfy the Department of Public Works that adequate good faith efforts have been made to meet the contract goal" or risk termination of its contract. Such efforts include advertising in trade-association journals and "minority focus media," direct solicitation and follow-up with specific DBEs, and assistance in obtaining bonding or insurance required by the contractor. Further, imposition of the Special Notice on both DBE and non-DBE contractors does not speak to whether DBE and non-DBE contractors shoulder the same duties under the Special Notice.

The district court relied on the analysis of <u>Concrete Works of Colorado, Inc. v. City and County of Denver</u>, 36 F.3d 1513 (10th Cir. 1994), to conclude that the Policy required Scott to compete on an unequal basis with DBE contractors. In <u>Concrete Works</u>, the Tenth Circuit held that where a city ordinance

---

[5]The parties and the district court uniformly use the terms "minority" and "nonminority" to describe "DBE"s and "non-DBE"s, presupposing that certification as a DBE involves a racial classification. Despite the apparent presupposition, the City argues <u>infra</u> that DBE classification is <u>not</u> dependent on race, but rather disadvantage. The distinction, however, is relevant only to our constitutional analysis and the degree of scrutiny to be applied to the classification. It is not relevant to an Article III "case or controversy" requirement. Therefore, for clarity's sake, we presume no such racial classification in our standing analysis and address only the differing obligations of DBEs and non-DBEs, whether race-based or not.

expressly allowed minority contractors to use their own work to satisfy minority participation goals, but nonminority contractors were required to seek out minority subcontractors, "the extra requirements impose costs and burdens on nonminority firms that preclude them from competing with MBEs...on an equal basis."[6] Id. at 1518-19. The district court applied this analysis, reasoning that the Policy at hand affords DBE contractors a similar advantage. The district court, however, was relying on language in the OBD's Policy Document, which it considered part of the relevant Policy.[7] Although we are focusing our inquiry on the Department's Special Notice, exclusive of the OBD's Policy

---

[6]Admittedly, the City of Jacksonville's ordinance at issue in Northeastern Florida differs from the Department's Special Notice in that the Jacksonville provision required 10% of the funds spent on city contracts to go to MBEs, and nonminority contractors were foreclosed from bidding on those projects reserved for MBEs. See Northeastern Florida, 508 U.S. at 658. The Special Notice, on the other hand, does not impose a rigid quota, nor does it foreclose non-DBE contractors' opportunity to bid. Non-DBE contractors in Jackson may submit bids on every construction contract. Nevertheless, what is dispositive for our standing analysis is that both the Jacksonville ordinance and the Department's Special Notice "make[] it more difficult for members of one group to obtain a benefit than it is for members of another." Id. at 666.

[7]The language in the Policy Document that the district court relied upon states in relevant part:

> The City may count as its M/WBE participation expenditures to M/WBEs that perform a commercially useful function in the work of a contract. An M/WBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of the contract and carrying out its responsibilities by actually performing, managing and supervising the work involved.

Document, we interpret the Special Notice's provisions similarly.

The Special Notice states under the heading "OBLIGATION" that "[t]he Contractor and any subsequent Subcontractor shall ensure that small business concern (DBE/WBE) have [sic] the maximum opportunity to participate in the performance of the work included in this contract." Further, "[f]ailure on the part of the contractor to carry out the requirements set forth shall constitute a breach of contract ...." Under the subheading "GOALS," the Special Notice states that "[t]he goal may be attained by subcontracting to, procuring materials from, and renting equipment from small business concerns (DBE/WBE)." Unlike the ordinance at issue in Concrete Works, this language does not expressly authorize a DBE contractor to satisfy DBE-participation goals by keeping the requisite percentage of work for itself. It would be nonsensical, however, to interpret it as precluding a DBE contractor from doing so. If a DBE contractor performed 15% of the contract dollar amount, it could satisfy the participation goal and avoid both a loss of profits to subcontractors and the time and expense of complying with the "good faith" requirements. See Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 707 (9th Cir. 1997)(finding standing where the challenged law exempted minority contractors from goal and "good-faith" requirements); Concrete Works, 36 F.3d at 1518-19. Non-DBE contractors obviously do not have this option. Thus, the Special Notice places Scott and other non-DBE contractors at a competitive disadvantage with DBE contractors.

17

Scott has made an adequate showing that future injury is imminent, entitling it to seek declaratory and injunctive relief. The record indicates that Scott frequently bids on the City's construction contracts, and Scott represented that it would continue to do so in the relatively near future. Therefore, as long as DBE preferences are used in the Department's Special Notice, Scott is threatened with imminent injury. In this way, standing's other prerequisites, causation and redressability, are also established, for removing the preferences that cause Scott to compete on an unequal basis will alleviate that "injury in fact."[8]

## 2. Constitutional Analysis

The district court found that the City's Policy--defined as including the Special Notice, the Program, and the Policy Document--created race-based preferences in the City's construction contracting. It therefore applied strict scrutiny to the racial classification and found the Policy violative of the Equal Protection Clause. Although we address only the Department's Special Notice, we reach the same conclusion.[9]

---

[8]The Supreme Court explained that causation and redressability were collapsed into its definition of injury in fact. See Northeastern Florida, 508 U.S. at 666 n.5 (stating, "It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury.").

[9]Because the parties focus our inquiry here on racial preferences, we will not address the analysis under intermediate scrutiny required for sex-based preferences.

18

The City contends that the Special Notice should not be subjected to strict scrutiny. First, the City argues that strict scrutiny should not be applied to policies that merely encourage participation "goals," rather than mandate strict "quotas." We agree with the district court, however, that it is irrelevant whether the Special Notice establishes "goals" or "quotas" for DBE participation. As the D.C. Circuit noted, the distinction is immaterial because "[a]ny one of these techniques induces an employer to hire with an eye toward meeting a numerical target. As such, they can and surely will result in individuals being granted a preference because of their race." Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344, 350 (D.C. Cir. 1998); see also Monterey Mechanical, 125 F.3d at 711 (stating that "the relevant question is not whether a statute requires the use of such measures, but whether it authorizes or encourages them" (quoting Bras v. California Pub. Utils. Comm'n, 59 F.3d 869, 875 (9th Cir. 1995)); Concrete Works, 36 F.3d at 1516-19 (reviewing policy establishing "goals" rather than "quotas" under strict scrutiny).

Next, the City contends that application of strict scrutiny is inappropriate because the Department's Special Notice does not create a racial classification. The City avers that the Special Notice's DBE classification creates a preference based on "disadvantage," not race, and that a relaxed standard of review applies to such preferences. The City is correct that race-neutral preferences are not subject to strict scrutiny, but

19

we are not persuaded that the Special Notice is race-neutral.

First, although the Special Notice does not state explicitly that a DBE is the same as an MBE, it does state explicitly that the Department is implementing the MBE Program so that "participation of minorities and women will be equitably distributed throughout the construction industry."  Further, even by its own terms, the Special Notice creates race-based presumptions that warrant strict scrutiny.

The Special Notice relies on Section 8(d) of the SBA for its definition of a DBE.  As noted above, Section 8(d) states that prime contractors are to "presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act."  15 U.S.C. § 637(d)(3)(C).  Sections 8(d) (the "8(d) program") and 8(a) (the "8(a) program"), as well as their implementing regulations, were also at the heart of the contract at issue in Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995).

In Adarand, a non-DBE subcontractor's low bid was rejected for a DBE subcontractor's bid under a prime construction contract let by a division of the Department of Transportation. The prime contract provided that the prime contractor would receive additional compensation if it hired subcontractors certified as "socially and economically disadvantaged

individuals," as that term was defined under Section 8(d). Like the City has argued here, the government in Adarand argued that "[t]he Subcontracting Compensation Clause program is...a program based on disadvantage, not on race, and thus that it is subject only to the most relaxed judicial scrutiny." 515 U.S. at 212-13 (internal quotations omitted).

In analyzing the 8(a) and 8(d) programs, the Supreme Court noted the inconsistencies between the two sections' implementing regulations. Both programs provided explicitly for a race-based presumption of social disadvantage. See 13 C.F.R. § 124.105(b)(1996). With respect to a determination of economic disadvantage, however, the provisions were conflicting. Those wishing to participate in the 8(a) program had to make an individualized showing of economic disadvantage. See 13 C.F.R. § 124.106(a)(1996). It was unclear, however, whether subcontractors in the 8(d) program were required to make individualized showings, or whether, as Section 8(d) itself suggests, the race-based presumption applied to both social and economic disadvantage. Compare 13 C.F.R. § 124.106(b)(1996)(apparently requiring 8(d) participants to make an individualized showing of economic disadvantage, though one that is "less restrictive" than that required for 8(a) participants) with 15 U.S.C. § 637(d)(3)(C), 48 C.F.R. § 19.703(a)(2)(1996)(apparently allowing 8(d) subcontractors to rely on race-based presumptions for both social and economic disadvantage). Nevertheless, in response to the government's

21

argument that a relaxed level of scrutiny should apply because

its program was based on "disadvantage, not on race," the Court

stated:

> To the extent that the statutes and regulations
> involved in this case are race neutral, we agree. [The
> government] concede[s], however, that the race-based
> rebuttable presumption used in some certification
> determinations...is subject to some heightened level
> of scrutiny.  The parties disagree as to what that
> level should be.

Adarand, 515 U.S. at 212-13 (internal quotations and citations

omitted). The Court held that strict scrutiny should apply. The

question of whether the SBA's implementing regulations were

interpreted as requiring 8(d) subcontractors to make

individualized showings of economic disadvantage was relevant

only to the result of the application of strict scrutiny, not to

whether strict scrutiny should apply.  See Adarand, 515 U.S. at

238-39 (remanding for determination of "whether any of the ways

in which the Government uses subcontractor compensation clauses

can survive strict scrutiny, and any relevance distinctions such

as [those involving a finding of economic disadvantage under the

8(a) and 8(d) programs] may have to that question....").[10]  Thus,

---

[10] On remand, the lower court held that, while Congress might well have the authority under Section 5 of the Fourteenth Amendment to "recognize a nation-wide evil" as a compelling government interest for the SBA's racial presumptions, the subcontractor compensation clause at issue was not narrowly tailored to serve that interest. Adarand Constructors v. Pena, 965 F. Supp. 1556, 1573-75, 1580-81 (D. Col. 1997)(noting that, as relied upon in federal subcontractor compensation clauses, the relevant SBA provisions and regulatory schemes were overinclusive and underinclusive, and that the inconsistencies within them "preclude a finding of narrow tailoring").  In response, the Small Business Administration amended the SBA's implementing regulations, lowering the evidentiary burden for nonminority

22

we too are required to strictly scrutinize the Department's Special Notice.

In Croson, the Supreme Court applied strict scrutiny to the City of Richmond's Minority Business Utilization Plan, requiring the City to demonstrate that there was a compelling interest for the plan and that the plan was narrowly tailored to serve that interest. See Croson, 488 U.S. at 493. The Court made clear that combating racial discrimination is a compelling government interest. See id. at 492. The Court noted, though, that a governmental entity can enact a race-conscious program to remedy past or present discrimination only where it has actively

_____

applicants to claim eligibility for disadvantaged status from "clear and convincing evidence" to "preponderance of the evidence" (reducing under-inclusion), see 13 C.F.R. § 124.103(c)(1)(1999), and clarifying that the race-based presumption of disadvantage is rebuttable (reducing over-inclusion), see 13 C.F.R. § 124.103(b)(3)(1999).

The effect of these, and other amendments, to the SBA's regulatory scheme are not relevant to our discussion here, even though the amendments would make it easier for nonminorities to be certified as DBEs for purposes of the Department's Special Notice and thus add nominal credence to the City's claim that DBE status is not based exclusively, at least, on race. First, these amendments did not exist at the time of the events in question and cannot be relied upon now as bases for decisions then. Second, even if these amendments were relevant, they would not forestall application of strict scrutiny. Neither the SBA itself nor its regulations have been declared unconstitutional--Adarand only addressed their use within a specific type of government contract--and racial presumptions remain incorporated explicitly in the SBA. Therefore, strict scrutiny still applies to use of these presumptions. The only difference today is that while the executive branch is bound to follow and implement the SBA, its regulations must be narrowly tailored to achieve its remedial objective. See 63 F.R. 35726, *35728 (June 30, 1998)(noting that the proposed amendment was "[i]n response to Adarand Constructors, Inc. v. Pena, 115 Sup. Ct. 2097 (1995), which requires [disadvantaged business] programs...to be 'narrowly tailored'").

23

discriminated in its award of contracts or has been a "'passive participant' in a system of racial exclusion practiced by elements of the local construction industry." Id. Therefore, the governmental entity must "identif[y] that discrimination with the particularity required by the Fourteenth Amendment," id., so that there is "'a strong basis in evidence for its conclusion that remedial action was necessary,'" id. at 500 (quoting Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277 (1986)). Specifically, the Court stressed that a governmental entity must establish a factual predicate, tying its set-aside percentage to identified injuries in the particular local industry. See id. at 499 (noting that the "defects are readily apparent in this case. The 30% quota cannot in any realistic sense be tied to any injury suffered by anyone.").

The Court provided some guidance in determining what types of evidence would justify the enactment of a remedial scheme. It stated,

> [i]f the City of Richmond had evidence before it that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion. *Where there is a significant statistical disparity* between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.
>
> ...Moreover, evidence of a pattern of individual discriminatory acts can, *if supported by appropriate statistical proof*, lend support to a local government's determination that broader remedial relief is justified.

24

Id. at 509 (emphases added)(citations omitted). Given Croson's emphasis on statistical evidence, other courts considering equal protection challenges to minority-participation programs have looked to disparity indices, or to computations of disparity percentages, in determining whether Croson's evidentiary burden is satisfied. See Concrete Works, 36 F.3d at 1526-27; O'Donnell Constr. Co. v. District of Columbia, 963 F.2d 420, 426 (D.C.Cir. 1992); Associated Gen. Contractors of California v. Coalition for Economic Equity, 950 F.2d 1401, 1414 (9th Cir. 1991); Cone Corp. v. Hillsborough County, Fla., 908 F.2d 908, 916 (11th Cir. 1990). Disparity studies are probative evidence of discrimination because they ensure that the "relevant statistical pool," Croson, 488 U.S. at 501, of qualified minority contractors is being considered.[11]

In the instant case, the City argues that it was error for the district court to ignore its statistical evidence supporting the Department's use of racial presumptions in its DBE-participation goals. The City highlights the disparity study it commissioned in response to Croson, which noted:

White males and African Americans were the only two

---

[11]We do not mean to embrace "the disparity study" as the determinative piece of statistical evidence for the enactment of, or justification for, a municipality's affirmative action program. Nor do we attempt to craft a precise mathematical formula to assess the quantum of evidence that rises to the Croson "strong basis in evidence" benchmark. The sufficiency of a municipality's findings of discrimination in a local industry must be evaluated on a case-by-case basis. We note only that an emphasis on disparity studies is particularly relevant to the case at hand because the City contests the district court's treatment of its own study.

groups to obtain public works contracts.  White males
received 999 contracts, 94 percent of all contracts,
and $264.9 million, 97.7 percent of all Public Works
contract dollars.  African Americans received 59
contracts, 6 percent, and $6.15 million, 2.3 percent
of contract dollars.  No women owned firms or firms
owned by other ethnic groups received contracts ....

The study concluded that "the City Council [should] consider a range of goals of 10-15 percent for both MBEs and WBEs."

Unfortunately, whatever probity the study's findings might have had on our analysis is of no moment.  The City refused to adopt the study when it was issued in 1995, and its belated reliance is unpersuasive.  Furthermore, the study was restricted to the letting of prime contracts by the City under the City's Program; it did not include an analysis of the availability and utilization of qualified minority subcontractors, the relevant statistical pool, in the City's construction projects.

We do not doubt in the least that the City of Jackson struggles, as it says, "to reverse the effects of its shameful racial history."  It is not alone.  The Supreme Court, however, has dictated that strict scrutiny applies to racial classifications, regardless of the race of those burdened or benefitted by the classification, see Croson, 488 U.S. at 494 (citing Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 279-80 (1986)), and it has announced the type of proof that will survive strict scrutiny, see id. at 509.  Had the City adopted particularized findings of discrimination within its various agencies, and set participation goals for each accordingly, our outcome today might be different.  Absent such evidence in the

26

City's construction industry, however, the City lacks the factual predicates required under the Equal Protection Clause to support the Department's 15% DBE-participation goal.  That is, it has failed to establish a compelling interest justifying the Special Notice.  Because the Special Notice fails a strict scrutiny analysis on this ground, we decline to address whether it is narrowly tailored.

**B.  Bench Opinion**

Scott sought damages from the City under 42 U.S.C. § 1983, which requires the City's actions to have been found "violative of...constitutional rights and [to] have caused compensable injury ...."  Carey v. Piphus, 435 U.S. 247, 255 (1978)(quoting Wood v. Strickland, 420 U.S. 308, 319 (1975))(internal quotations omitted).  Therefore, following its Opinion and Order declaring that goals for the participation of DBE subcontractors in the City's construction contracts violated the Fourteenth Amendment, the district court held an evidentiary hearing to determine whether Scott's bid was rejected because of its failure to meet the unconstitutional goals, and, if so, what damages Scott was entitled to.  The district court found that Scott's bid was rejected because Scott failed to include 15% DBE participation, and it awarded Scott approximately $11,600 in lost profits.

The City has consistently maintained that Scott's bid was rejected because it exceeded the 1996-97 budget, not because Scott failed to meet the DBE-participation goal.  On appeal, the

City contends that material facts regarding causation were in dispute and that the district court erred by relying on these facts in its award of damages to Scott. The City would be correct if it had requested a jury for resolution of these issues, but because it did not, we review the district court's findings of fact for clear error. See Sepulvado, 158 F.3d at 895. A district judge's assessment of damages is also a finding of fact which, absent error of law, is entitled to the deferential clearly erroneous standard of review. See Broehms v. Crowell, 139 F.3d 452, 459 (5th Cir. 1998). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. See Henderson v. Belknap (In re Henderson), 18 F.3d 1305, 1307 (5th Cir. 1994). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. See Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

The district court determined that Scott's bid was rejected for failure to comply with the DBE goal based on testimony elicited at the hearing. Both sides presented plausible testimony regarding the rejection of Scott's bid, and the district judge noted:

> [T]his is a contest between credibility of the testimony of W.H. Scott, the president of W.H. Scott

28

Construction Company, Inc., the plaintiff, and Louis Armstrong, the councilman for the City of Jackson who was then and presently is serving as president of that body. Based upon the court's determination of the credibility of these witnesses, there is circumstantial evidence to consider.

In considering the circumstantial evidence, the court noted that again it was "faced with the question of which side to believe and must be guided by the burden of proof which is on the plaintiff to prove its case by a preponderance of the evidence." The court was finally persuaded by three pieces of circumstantial evidence that Scott's bid was rejected because it did not meet the DBE goal. First, the only discussions between the Department and Scott prior to the rejection of Scott's bid focused solely on Scott's lack of minority participation, not on budgetary concerns. In addition, although the City maintains that the City Council was not aware of those discussions between Scott and the Department, and thus would not have based its rejection of Scott's bid on a failure to comply with the Special Notice, Louis Armstrong offered conflicting accounts of whether or not he had discussed Scott's bid with the Department's manager prior to the City Council vote. Second, Armstrong first testified that he had not discussed Scott's bid with the other City Council members prior to their vote, but he then equivocated and testified that he had spoken to one or two of them. Third, although the City claimed to have wanted to expand the building project rather than accept Scott's bid, the district court noted that one of the reasons the City proffered for expansion of the project--a $125,000 water-proofing

29

assignment--never even occurred.

Given the deferential standard under which we review these findings and the "credibility contest" the district court faced, we conclude that it is plausible in light of the entire record that the City Council rejected Scott's low bid because Scott failed to meet the Special Notice's DBE-participation goal, not because Scott's bid exceeded the City's budget. Furthermore, because no arguments were presented contesting the amount of damages awarded Scott, we affirm the award of lost profits in the amount of $11,643.

IV.

For the foregoing reasons, the district court's judgment is AFFIRMED.