IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-30067

_____


MICHAEL X. ST. MARTIN and VIRGINIA RAYNE ST. MARTIN,

Plaintiffs - Appellees - Cross-Appellants

v.

MOBIL EXPLORATION & PRODUCING U.S. INC.; PHILLIPS PETROLEUM
COMPANY,

Defendants - Appellants - Cross-Appellees

---------------------------------
Appeals from the United States District Court
for the Eastern District of Louisiana
---------------------------------
August 16, 2000

Before BARKSDALE, BENAVIDES and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

Defendant oil companies appeal from a $240,000 damage award
based upon a finding that they failed adequately to maintain
spoil banks on canals operated by them, resulting in damage to a
freshwater flotant marsh.  Because we find that the district
court carefully weighed the competing evidence and fashioned a
reasonable remedy for the breach of the canal servitude
agreements in issue, we affirm.

I.  *Facts and Procedural History*

This case involves a suit for restoration and money damages
arising out of the deterioration of a portion of the Mandalay

1

Marsh in Terrebone Parish, Louisiana.  The plaintiffs in this case are private landowners who live near the tract in question and who hold other land in coastal Louisiana.  The defendants are oil companies who possess an overlapping mineral lease and canal servitudes across the St. Martins' property.  The St. Martins allege that the oil companies' use of and failure to maintain the canals has caused erosion and other damage to the freshwater flotant marsh ecosystem present on their property.[1]

The previous owner of the property was Southdown Sugars, Inc. [Southdown].  Beginning in 1966, Southdown initiated several mineral conveyances which separated the surface ownership of the property from the minerals.  In that same year, Superior Oil Company [Superior] secured servitudes to dredge canals from the Intracoastal Waterway into the tract in issue.  Superior dredged the canals in 1966 and used them until 1985, when it conveyed its interest in the canal servitudes and the adjoining oilfield to defendant Mobil Exploration & Producing U.S., Inc. [Mobil].  In 1995, Mobil conveyed its interest in the field to defendant Phillips Petroleum Company [Phillips].

In 1992, the St. Martins purchased the surface rights to the 7,000 acre tract owned by Southdown for about $245.00/acre.  Soon thereafter, they conveyed all but 2,400 acres of the tract to the

---

[1]A flotant marsh is one in which a thick mat of vegetation floats on one to two feet of water that covers the land.  Such marshes are considered a fragile and important ecosystem in coastal Louisiana.

2

Nature Conservancy for approximately their purchase price. The St. Martins also donated $140,000 to the Nature Conservancy in support of its efforts to set up a wildlife refuge on the Mandalay marsh property. The area of marsh in issue in this case comprises 357 acres of the 2,400 acres the St. Martins retained.

The St. Martins contend that gaps in the spoil banks flanking the oil companies' canals allow water to flow into and out of their marsh, eroding the floating marsh mat and leaving open ponds. These open ponds disrupt the ecosystem, represent loss of the vegetative mat, and provide openings for invasive plant species. Aerial photographs taken before the St. Martins' purchase of the marsh reveal the formation of open-water ponds. The St. Martins provided additional aerial photograph evidence of further formation and enlargement of ponds subsequent to their 1992 purchase.

In 1995, the St. Martins filed the instant case against Mobil and Phillips. They describe their complaint as raising causes of action under the canal servitude agreements, the mineral lease, and negligence-based tort. They raised additional claims in their post-trial brief based on Louisiana Civil Code articles 667-669, Civil Code article 2317, breach of promise, failure to use alternative means, and the public trust doctrine. The complaint sought damages pursuant to a restoration plan for the marsh, which would include constructing bulkheads along the canals and refilling the eroded areas.

3

The oil companies moved for summary judgment on two aspects of the St. Martins' claims, arguing that they were not entitled to compensation for damage that occurred prior to their purchase of the marsh and that damages should not exceed the value of the property. The district court granted judgment on the first argument and denied it on the second portion of their motion. A bench trial followed on liability and damages accruing since 1992.

After requesting additional submissions from the St. Martins to clarify the extent of damage since 1992 and to scale back their proposed restoration plan, the court found that the oil companies had an implied obligation to maintain spoil banks arising out of the canal servitude agreements and that they had breached that duty. The court further found that forty acres of marsh had been damaged since 1992, for which the defendants were 60% responsible (natural forces being responsible for the remaining 40% of the damage). The court ordered restoration damages in the amount of $10,000 per acre adjusted for percent responsibility, or $240,000 total. Defendants appeal the determination of liability and the amount of damages; the St. Martins appeal the limitation of the award to the equivalent of 24 acres of damaged marsh.

## II. *Analysis*

Appellants attack the district court's judgment on three

4

primary fronts. First, they argue that the St. Martins failed to adduce adequate causation evidence linking the oil companies to any deterioration of the marsh. As part of that argument, the oil companies contend that the district court erred in allowing the plaintiffs' expert, Dr. Robert Chabreck, to testify. Defendants also argue that even if causation were to be established against them, they could not be held liable under Louisiana servitude or tort law. They contend that the St. Martins' claim is prescribed as a matter of Louisiana law and that, contrary to the district court's determination, the canal servitude agreement does not impose a continuing duty to maintain and repair the canal banks. Lastly, the oil companies argue that the damages awarded by the district court exceed those allowed by Louisiana law because, on a per-acre basis, they are greater than the market value and purchase price of the land.

A.   *Causation*

Defendants challenge the sufficiency of the St. Martins' causation evidence on two basic grounds. First, they argue that the St. Martins' expert evidence was deficient under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and related precedent. Second, they argue on the merits that natural forces, and not their activities in the canal servitudes, caused whatever damage the marsh has sustained over the last thirty years.

In cases presenting questions of both law and fact, this

5

Court reviews findings of fact for clear error and questions of law de novo. *See Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996). The district court's determination of admissibility of expert evidence under *Daubert* is reviewed for abuse of discretion. *See Moore v. Ashland Chem.*, 151 F.3d 269, 274 (5th Cir. 1998) (en banc). Even assuming an abuse of discretion occurred, the erroneous admission is subject to a harmless error analysis. *See United States v. Matthews*, 178 F.3d 295, 304 (5th Cir. 1999); *United States v. Griffith*, 118 F.3d 318, 323 (5th Cir. 1997). "In a bench trial, reversal is only warranted if all of the competent evidence is insufficient to support the judgment, or if it affirmatively appears that the incompetent evidence induced the court to make an essential finding which it otherwise would not have made." *Southern Pacific Trans. Co. v. Chabert*, 973 F.2d 441, 448 (5th Cir. 1992).

1. *Admissibility of plaintiffs' expert evidence*

Defendants first challenge the district court's acceptance of the St. Martins' expert, Dr. Chabreck. Dr. Chabreck is a specialist in the ecology of the region and not an expert in hydrology. He has, however, spent many years in observation of coastal marshes in Louisiana and had visited and examined the marsh in question on several occasions prior to trial.

Defendants assert that Dr. Chabreck fails all of the non-exclusive *Daubert* factors, in that he is not a trained

6

hydrologist, hasn't published an article relating to his specific hypothesis in this case, his hypothesis has not been subject to peer review and is not supported by specific studies and he hasn't conducted tests to verify his hypothesis. *But see Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) ("As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function.").

Defendants' arguments on this point fail for several reasons. First, Dr. Chabreck's expertise in marshland ecology and in the erosion of vegetative mats in particular, along with his personal observation of the St. Martins' property, sufficiently qualified him to testify as an expert.[2]

Defendants suggest that only a qualified hydrologist could have testified as to whether canal water intrusion occurred at sufficient levels and speeds to erode the vegetative mat. *Cf. Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (in deciding whether to admit expert testimony, the district court considers whether the witness is qualified in an appropriate field).

---

[2]Dr. Chabreck, a professor of wildlife at Louisiana State University, has studied marshland ecology extensively. He has published over 130 scientific and popular articles on wetlands and wildlife management and has planned and evaluated marsh development programs for marsh wildlife refuges for the State of Louisiana. He has professional experience with the U.S. Fish and Wildlife Service, as a refuge and research biologist, and has garnered significant acclamation for his work and publishing on marsh ecology and management.

7

While a hydrologist might be better trained than a marshland ecologist in the abstract physics of water forces, he would have less relevant expertise in the kinds and amounts of stresses on the organisms making up the vegetative mat that could cause degradation of the mat. A hydrologist could (and did) testify as to observed speeds of canal water intrusion into the marsh through the gaps in the defendants' canals' spoil banks;[3] however, the significance of that information for the health and stability of the vegetative mat would be within the expertise of a marshland ecologist such as Dr. Chabreck. The district court did not abuse its discretion in finding Dr. Chabreck qualified to testify as to the dynamics within the St. Martins' flotant marsh. *See Watkins v. Telsmith Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) ("District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous") (internal quotations omitted).

As to the substance of Dr. Chabreck's testimony, the

---

[3]A defense expert measured the speed of water entering through the gaps in the canal spoil banks and testified that the average speed of water caused by barge waves in the canal was roughly equivalent to what would be experienced through wind pressure. However, he conceded that barge waves could enter the St. Martins' marsh at speeds of up to one knot. When shown a sample of water exiting the marsh taken at the site where he measured the barge-wave speed, he also conceded that it contained organic matter presumably removed from the marsh.

district court made adequately supported findings that his report was sufficiently reliable and relevant to come in as expert testimony. The *Daubert* factors are non-exclusive and need not be rigidly applied in every case. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1171 (1999) ("the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case"); *see also Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999).

Here, Dr. Chabreck's theory regarding damage to the St. Martins' marsh arose from his general understanding of the dynamics within flotant marshes and the environmental factors which can cause erosion of vegetative mats, combined with personal observation of the marsh in question. Among the experts presented at trial, Dr. Chabreck (along with plaintiffs' surveyor) was the only one to conduct an extended on-site observation of the St. Martins' marsh. He visited the property on five occasions, examining both the damaged areas near the spoil-bank gaps and identifying two test or control areas which were bordered by intact spoil banks. Those test areas did not exhibit the same damage to and erosion of the marsh mat as those areas exposed to gaps in the canal spoil banks. His direct observations of the marsh included photographs he took of portions of vegetative mat being carried out of the gaps in the

9

canal spoil banks as waves exited the marsh.

Each marsh will have different forces acting upon it, depending upon its specific location and its surroundings.[4] Thus, a court could not rationally expect that a marshland expert would have published a peer-reviewed paper on each possible permutation of factors or each damaged area of marsh. Dr. Chabreck's testimony was based on his personal observation of the marsh in question and his general and undisputed expertise on marsh ecology and deterioration.[5] The district court properly considered alternative indices of his testimony's reliability and relevance. *See Kumho Tire*, 119 S.Ct. at 1175-76.

2.    *Causation evidence*

Defendants also challenge the ability of the St. Martins' causation evidence as a whole to support the court's liability finding; they argue that their use of and failure to maintain the canals could not have been the cause in fact of the damage to the St. Martins' marsh. However, the district court had before it an adequate quantum of evidence from which it could conclude that the defendants' canals were partially responsible for the

---

[4]All experts agreed at trial that marsh deterioration can be caused by a complex and synergistic interaction among several different factors. The precise factors and their relative importance will vary with individual areas of marsh loss.

[5]Notably, a defense expert conceded that barge waves entering and exiting a marsh through gaps in canal spoil banks could erode the vegetative mat; that expert thus corroborated the validity of Dr. Chabreck's theory even while disputing its application to the marsh in issue.

10

observed deterioration of the marsh; that evidence consisted of a series of aerial photographs documenting progressive deterioration of the St. Martins' marsh property and the testimony of experts for both sides, as well as testimony from Michael St. Martin and other lay witnesses who were familiar with the area.

Defendants offer several alternative explanations for the deterioration of the marsh mat in issue.  First, they contend that damage from hurricanes, and Andrew in particular, can be blamed for the marsh mat loss.  However, their evidence on this point does not lead to the conclusion that the district court committed clear error in discounting it.  Defendants offered lay eye witness testimony to the effect that some vegetative mat was seen outside the marsh boundaries following hurricane Andrew. Dr. Chabreck explained that the vegetation could have been carried from farther away where the brunt of direct damage occurred and deposited in the region.  He also relied on previous research he had conducted to conclude that the marsh in question was likely too far inland to experience significant loss of vegetation due to hurricanes.  The defense expert who testified regarding hurricane damage on the St. Martins' property admitted that he had not visited the property and that he could only testify regarding the *possibility* of hurricane damage based on his reading of general scientific literature on the subject.

Defendants also contend that salt intrusion from the

11

Intracoastal Waterway is responsible for the St. Martins' marsh mat loss. While all experts agreed that salt intrusion can damage freshwater marshes as a general principle, the salinity tests actually performed on the St. Martins' property were inconclusive as to whether significant salt intrusion had in fact occurred there and whether it could be a cause of the deterioration of the vegetative mat.[6] Significantly, the test areas identified by Dr. Chabreck, which would presumably be subject to the same salinity, did not show signs of deterioration.

Defendants also contend that nutria eat-outs damaged the St. Martins' marsh. However, the evidence on nutria eat-outs did not clearly establish their responsibility for the damage. Dr. Chabreck testified to his personal observations of the marsh as well as his previous studies of nutria behavior, and noted that their numbers had declined in recent years. He also explained that they do not generally have a significant impact upon healthy marsh but rather may be more visible in and more attracted to marsh mat that has already been damaged by another force. Defendants and the St. Martins provided contradictory lay eye witness accounts of the nutria activity in the marsh. Similarly,

_____

[6]Salinity levels in nearby canals were found to be relatively high during the drought period in which they were tested. A test of a sample of the water located at the base of a section of floating mat in the affected area, collected at another time, did not detect any elevated salinity.

defendants' suggestion that herbicide spraying by government agencies could have contributed to the deterioration of the marsh in issue was contradicted by Dr. Chabreck's explanation of the effects of the herbicide, i.e. that it would not affect the dominant plants in healthy marsh mat, and by St. Martin's testimony that herbicide had not been used on his property.

Finally, defendants contend that subsidence and relative sea level rises contributed to the deterioration of the marsh. Subsidence is a factor region-wide, but its effects on the area in issue were not clearly demonstrated in the court below. While not denying that subsidence can affect coastal marshes, Dr. Chabreck pointed again to the test areas which were unaffected by any of the systemic explanations offered by defendants.

The entirety of the evidence on causation must be evaluated through an appropriate lens. First, the district court did not entirely reject defendants' evidence regarding alternative causes for the observed marsh mat loss. Instead, the court followed the consensus of all experts, and especially those presented by the defense, that marsh loss is a result of complex and synergistic forces. The test areas identified by Dr. Chabreck were unaffected by the forces described by defendants' experts, suggesting that those forces could not be the sole causes of marsh mat loss elsewhere on the property. And though he disputed its applicability to the marsh in issue, a defense expert admitted that barge wave traffic could be a cause of marsh mat

13

erosion.  Defense experts also conceded that man-made forces
(including oil and gas activity and canals) were an identified
factor in marsh loss in coastal Louisiana and the areas
immediately surrounding the property in issue.[7]  Given the
evidence before it, the district court's approximation of fault
for the marsh mat loss was by no means unreasonable.

Second and more importantly, as an appellate court reviewing
factual findings of the trial court, we are not charged with a de
novo reweighing of the evidence.  Our only role is to determine
whether the district court committed clear error.
Defendants' evidence on causation was before the district court
through their experts, as were the parties' contradictory
explanations for the erosion of the vegetative mat.  There is
nothing in the record to indicate that the court committed clear
error in accepting one explanation over another.  *See, e.g.*,
*Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1559 (5th Cir.
1985) ("an appellate court is not free to reweigh the evidence or
to re-evaluate credibility of witnesses or to substitute for the
district court's reasonable factual inferences from the evidence
other inferences that the reviewing court may regard as more
reasonable");  *Atlantic Marine Inc. v. Bruce*, 661 F.2d 898, 900

---

[7]One defense expert suggested (and then later retracted the
comment) that man-made forces were responsible for about 29% of the
damage to coastal marshes.  Other defense experts contended that a
percentage responsibility is almost impossible to ascertain given
the complex interactions among forces causing marsh loss.

(5th Cir. 1981) (the resolution of conflicting evidence is the prerogative of the fact finder).

The district court admitted testimony from experts on both sides, and was entitled to weigh the evidence presented by each to come to its ultimate determination.  It did not commit clear error in choosing one explanation over another where both were properly admitted.

B.   *Liability*

Defendants argue that they cannot be held legally responsible for any damage to the St. Martins' marsh, regardless of causation.  Defendants argue that (a) the canal servitude agreements do not contain an implied obligation to construct or maintain canal banks, (b) even if such an obligation exists, any damage claim accrued as early as 1973 when the first marsh erosion occurred and was waived by the St. Martins' predecessor in interest, Southdown, and is now time barred, and that (c) prescription under Louisiana law bars the St. Martins' claim. The district court based its finding of liability upon its interpretation of the canal servitude agreements.  The district court's interpretation of a contract is reviewed de novo.  *See Musser Davis Land Co. v. Union Pacific Resources*, 201 F.3d 561, 563 (5th Cir. 2000).  The contract and record are reviewed independently and under the same standards that guided the district court.  *See Exxon Corp. v. Crosby-Mississippi Resources,*

15

*Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998).

The district court held that it would not allow recovery for any damage occurring prior to the St. Martins' purchase of the marsh in 1992. *See St. Jude Medical Office Bldg. Ltd. Part. v. City Glass and Mirror, Inc.*, 619 So.2d 529, 530 (La. 1993). Defendants' objections must rest, therefore, on a theory under which the St. Martins' claim is entirely barred regardless of new damage occurring during their period of ownership.

Regarding defendants' contention that the St. Martins' claim prescribed ten years after the first observable damage occurred, the district court held that the canal servitude agreements impose continuing obligations on defendants.[8]  The court therefore fashioned a remedy for damage occurring during the St. Martins'

---

[8]Defendants cite to the Louisiana Supreme Court's decision in *Crump v. Sabine River Authority*, 737 So.2d 720 (La. 1999), to support their argument that prescription runs from the first damage where a continuing tort theory is inapplicable.  That case is distinguishable here, however.  First, while the St. Martins raise a continuing tort theory in their brief, the district court's holding was based on continuing *obligations* under a contract still in force and awarded what amount to contract damages and enforcement; the district court did not rely on a continuing tort theory at all.  Second, *Crump* states that prescription runs from the first damage where continuing tort theories do not apply because the damage is discontinuous or because the damages are not successive.  In that case, the continuing presence of a canal was not sufficient to preclude prescription.  However, the damage alleged in this case is not the mere presence of the canals or a static condition related to their existence (e.g. diversion of water as part of their normal course of operation), but an ongoing and cumulatively increasing deterioration of plaintiffs' property adjoining the canals due to defendants' continuing conduct in their failure to maintain the canal banks.

16

ownership and designed to prevent future deterioration of the marsh which would otherwise continue unabated.[9]

Where a written agreement exists, it is the law between the parties and must be enforced according to its terms. *See Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir. 1986). When a servitude is created by contract, as in this case, the mode of use of the servitude is regulated by that contract. *See Ogden v. Bankston*, 398 So.2d 1037, 1040 (La. 1981). This servitude agreement provides that it "shall extend to and be binding upon the respective successors and assigns of the parties hereto," and is therefore enforceable by the St. Martins. It also specifies the nature and uses of the canals and provides that "Grantee further agrees to pay Grantor for any damages occasioned to Grantor's lands as a result of the construction, use and

---

[9]Defendants argue that the St. Martins' claim would still be time-barred even under the servitude agreements as construed by the district court, since they knew of damage as early as 1992. However, the servitude agreements provide that the rights granted under them, including the surface owner's right to maintenance of the canals, may be enforced until the expiration of the leases described in the agreements, including the mineral lease still in force. Thus, the terms of the contract itself provide for a continuing right of enforcement of the continuing duty to maintain or repair the canals. The harm alleged by the St. Martins is an *ongoing* violation of the servitude agreements, not a one-time action or default on the part of defendants. Because their claims could sound in both tort and contract, the St. Martins are entitled to rely on the contractual prescriptive period of ten years. *See Ridge Oak Dev., Inc. v. Murphy*, 641 So.2d 586, 588-89 (La.App. 4 Cir. 1994). The St. Martins' case was filed well within the ten-year prescriptive period for contract damages arising after their purchase of the property in 1992.

maintenance of the canal." *Id.* The district court correctly interpreted this agreement as extending to the current parties and imposing continuing maintenance and compensation obligations on the holders of the canal servitudes.[10]

Because we uphold the award under the canal servitude agreement, we need not reach the other theories advanced by the St. Martins, including liability under the mineral lease, the Louisiana Mineral Code, and negligence. The St. Martins also argued in their post-trial brief liability under Civil Code articles 667-669, Civil Code article 2317, breach of promise, failure to use alternative means, and the public trust doctrine. These other theories advanced by the St. Martins do not control the case here; their dispute with the defendants centers upon the use and maintenance of the canal servitudes and is therefore governed by the servitude agreements. *See, e.g.*, *Ryan v. Southern Nat. Gas Co.*, 879 F.2d 162, 163-65 (5th Cir. 1989) (terms of canal servitude rather than independent statutory

---

[10]Phillips raises the additional point that under the terms of its assignment from Mobil, it should not be held liable for any damages prior to its acquisition of the canal servitudes. It further argues that the St. Martins failed to establish what damage occurred during its ownership of the canal servitudes, after 1995 and before 1997. Phillips has a continuing obligation under the servitude agreements to maintain and repair its canal banks and to compensate the surface owners appropriately. The St. Martins proved damage over a time frame that includes two years of ownership by Phillips, and it is therefore appropriately included in the judgment. The issue of indemnification between Phillips and Mobil is not before the Court and the proper apportionment of damages between the defendants is not therefore for us to decide.

18

provisions govern).

C.    *Damages*

Defendants argue that the damages awarded are excessive under Louisiana law because, at $10,000 per acre, they exceed the purchase price and market value of approximately $245 per acre. The St. Martins, on the other hand, contend that the district court improperly limited its award to the equivalent of 24 acres, when a total of 357 acres have been damaged over the life of the canal servitudes.

The award of damages by a district court is reviewed for clear error.  *See W.H. Scott Construction Co., Inc. v. City of Jackson, Mississippi*, 199 F.3d 206, 219 (5th Cir. 1999);  *Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir.1998).   If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion.  *See W.H. Scott, supra*.  Given the district court's ruling that plaintiffs are not entitled to pre-purchase damages and its weighing of the evidence to find that natural causes were partly at fault, the limitation of damages was not clear error.  The defendants' argument regarding excessive damages warrants further discussion, however.

Under *Roman Catholic Church v. Louisiana Gas Serv. Co.*, 618 So.2d 874, 879-880 (La. 1993), restoration damages in excess of property value are available only where there is "a reason

19

personal to the owner for restoring the original condition or there is a reason to believe that plaintiff will, in fact, make the repairs."

In the present case, the district court found that the St. Martins have demonstrated genuine interest in the health of the marsh through their efforts on behalf of the Mandalay Wildlife Refuge, including a $140,000 gift to the Nature Conservancy to support its creation of the refuge (now run by the U.S. Fish and Wildlife Service), and continuing aid through the donation of labor and resources.  The St. Martins live adjacent to the marsh in question, and Mr. St. Martin has used it for hunting and other recreational purposes for a considerable period of time.  The marsh itself is of significant public value; it is part of a rapidly diminishing number of marshes that have been identified by national conservation efforts as key environmental and ecological resources.  Michael St. Martin attempted repairs of the canal banks (which proved to be unsuccessful) and undertook other restorative projects.  Under these circumstances, the St. Martins' case falls within the *Roman Catholic Church* allowance of greater than market value damages.[11]

---

[11]Defendants argue that the St. Martins had a commercial motive for buying the property in issue and that therefore greater than market value damages are inappropriate.  However, the mere existence of a commercial interest in the property does not foreclose greater than market value damages where the plaintiff also demonstrates a significant personal interest in the property as well.  *See Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans*, 753 So.2d 269, 279 (La.App. 4th Cir. 1999).  Here, the

Even though it found that the marshland had personal significance warranting greater than market value damages, the district court did not accept in toto the St. Martins' restoration plan. Quite to the contrary, it required the St. Martins to revise their original plan, finding it excessive as to both the scope of the undertaking (refilling the entire marsh) and the amount of money required. The district court accepted the revised plan, which was scaled down in both cost and scope.[12]

In addition to reducing the per-acre amount sought by the plaintiffs, the district court also radically reduced the number of acres' damage for which they would be compensated. The plaintiffs originally sought damages for 357 acres. The district court properly refused to grant damages for deterioration occurring before the St. Martins bought the property, and found that only forty acres had suffered damage during their period of ownership.[13] The district court credited defendants' explanation

---

St. Martins have clearly established a strong personal interest in the marsh and the possibility of an additional commercial interest does not foreclose damages under *Roman Catholic Church*.

[12]The cost of the plan was reduced upon the district court's required revisions from the equivalent of $39,000 per acre (approx.) to $10,000 per acre (approx.).

[13]Defendants object to the admission of testimony by Charles Camp, plaintiffs' surveyor witness, as to the approximate damage to the marsh between 1993 and 1997 as documented by two aerial photographs. Mr. Camp had testified at his deposition that he was not prepared to make an "eyeball estimate" of damaged area based on aerial photographs of the marsh. That earlier statement goes to the weight to be accorded Camp's trial estimate. At trial, Camp described his methodology to the court in giving his estimate. In

of causation to a certain degree, and found that natural forces were 40% responsible for the observed damage since 1992. In total, these changes reduced the plaintiffs' award from the $14 million originally sought to the $240,000 ultimately granted. The district court carefully weighed the evidence and interests in determining its award, and did not commit any clear error in granting plaintiffs damages. We will not reverse the award.


CONCLUSION

The district court's holding that the St. Martins are not entitled to damages for deterioration occurring before their purchase of the marsh is unquestionably correct. *See St. Jude Med. Office Bldg. Ltd. Partnership v. City Glass & Mirror, Inc.*, 619 So.2d 529, 530 (La. 1993). There is nothing in the record to demonstrate that the court's factual findings constitute clear

---

answer to questions both from counsel and the bench, he stated that he did a little scaling but mostly relied on the photographs' scale and tabulated the increased damage based on the affected areas in the photographs, adjusted by his understanding of the topography of the site. In colloquy with the court, it was established that there was a certainty of damage between 1993 and 1997, with only an estimate as to the number of acres affected. Though Camp is not a trained photogrammetrist, he did testify to many years' experience working with aerial photographs as part of his surveying practice. Defendants had a full opportunity to cross examine Camp, including attempted impeachment with his deposition testimony. Defendants did not offer any evidence of their own as to how many acres of damage accrued between 1992 and the time of trial. Under the circumstances, it was within the court's discretion to credit Camp's figure as an estimate of marsh loss, which it was then free to discount for possible alternative causes of damage.

22

error.  Similarly, nothing compels the conclusion that it was an abuse of discretion to admit the St. Martins' expert evidence. The district court's damages award was supported by the evidence and appropriate under Louisiana law.  We affirm.

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting in part:

Although I agree with the majority that the St. Martins are *not* entitled to damages for the period prior to their acquisition of the property, I must dissent, most respectfully, from the imposition of any liability. I do so because: the district court abused its discretion in permitting Dr. Chabreck to give expert testimony that barge bow waves entering the marsh through the few gaps in the spoil banks provide sufficient force to erode the vegetative mat; and the servitude agreement does *not* impose a duty to maintain those spoil banks. (I do *not* address the St. Martins' other claimed liability-bases; they were *not* reached by either the district court or the majority.)

I.

An additional recitation of pertinent facts is necessary. The canals are only 7000 feet long (approximately 1.33 miles). In the spoil banks, there are only approximately six gaps (each approximately 10 to 15 feet wide).

The canals were dug in the 1960s, pursuant to a servitude agreement granting Superior the right to deposit spoil, created by dredging the canals, within 150 feet of each side of the canals' banks. Most importantly, the agreement does *not* mention — much less require — Appellants to construct a *levee system* for

24

the canals.  In fact, pursuant to the agreement, the canals were to cause as little interference as possible with drainage.

Two other companies' pipelines cross the spoil banks at gaps; those gaps are larger than the ones at issue.  In addition, during the lengthy time period (more than 25 years) between the canals' construction and the St. Martins' purchase in 1992, their predecessor in interest, Southdown Sugars, Inc., did *not* complain about the spoil banks' maintenance.

## II.

### A.

In determining whether expert testimony is admissible, the district court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable". ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 589 (1993). It is *relevant* when it relates to any issue in the case, ***id.*** at 591; *reliable*, when "grounded in the methods and procedures of science and ... more than unsupported speculation or subjective belief".  ***Curtis v. M&S Petroleum, Inc.***, 174 F.3d 661, 668 (5th Cir. 1999).  A district court abuses its discretion if it admits expert testimony that is *not* relevant and reliable.  *See* ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 145 (1999).  Pursuant to this standard of review, the court abused its discretion in admitting Dr. Chabreck's testimony.

#### 1.

District courts must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training, or education". FED. R. EVID. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.

*Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

A key issue is whether Dr. Chabreck is qualified to testify as an expert on whether barges' bow waves, moving from the Intracoastal Waterway into the canals, and then passing through the spoil bank gaps, provide sufficient force to erode the vegetative mat. The following trial colloquy delineates Dr. Chabreck's theory:

> [**Attorney for Mobil**:] Your *theory of causation* ... is that barge induced waves enter cuts that have somehow formed over the years in the ... canals, and that *hydrologic force* has been exerted on the mat, to a degree necessary or sufficient to erode that mat, is that correct?
>
> [**Dr. Chabreck**:] That's correct, sir.
>
> [**Attorney for Mobil**:] Okay. Now, that force that is applied, that *erosive action*, ... is *studied by scientists known as hydrologists*, is that correct?
>
> [**Dr. Chabreck**:] That's correct.

(Emphasis added.)

Testimony concerning whether the waves have *sufficient force* to erode the vegetative mat should be by a hydrologist; Dr.

Chabreck's testimony supports this.  In fact, he admitted at trial he would defer to a hydrologist on these matters.

Dr. Chabreck, who has a B.S. in Forestry, an M.S. in Wildlife, and a Ph.D. in Botany, is a Professor of Wildlife at Louisiana State University; has worked for the U.S. Fish and Wildlife Service as a Wildlife Biologist and Assistant Secretary; and has published more than 130 articles in popular and scientific journals.  (His resume does *not* delineate how many of these articles are relevant to floatant marsh damage.)  He is certified as a wetland scientist by the Society of Wetland Scientists and as a professional wildlife biologist by the National Organization of the Wildlife Society.  His resume states he has extensively studied marsh ecology, wetlands management, and wetland restoration.  Obviously, this is a most impressive resume, *if* coastal marsh management is at issue.  But, it does *not* demonstrate expertise in hydrology — the primary subject at hand.

On cross-examination, Dr. Chabreck admitted:  he took *no* hydrology courses in obtaining his degrees; and his only formal training in hydrology is from courses that might touch on water pressure, water management, and water chemistry.  His work experience has involved wetlands management, mostly in Southwestern Louisiana; and he has been involved in wildlife

management and marsh research.  This does *not* translate into the requisite expertise in hydrology.

Therefore, Dr. Chabreck is *not* qualified to render expert testimony on:  hydrologic forces generated by the bow waves of barges in the Intracoastal Waterway; what forces the waves create when they enter the spoil bank gaps; what force is present when the waves reach the vegetative mat; or whether this force is sufficient to cause erosion of the mat.

Concerning hydrology, Dr. Chabreck is *not* qualified as an expert by education; his emphasis is wildlife.  Nor is he qualified  by knowledge, skill, experience, or training; his focus is on marsh *wildlife management* and restoration, *not hydrology*.  True, in order to restore marsh damage, he has to have some degree of knowledge regarding what causes it; but, as demonstrated by his restoration plan to create an attached marsh (the vegetation is attached to the soil rather than floating on top of several feet of water), this does *not* necessarily apply to a floatant marsh.  Therefore, in the light of Rule 702's requirements, he is *not* qualified to render expert testimony on hydrologic forces exerted on the vegetative mat, resulting from waves caused by barges in the Intracoastal Waterway.

2.

Even assuming Dr. Chabreck is qualified to give expert testimony on this matter, the opinion he rendered does *not* meet *Daubert's* requirements. There, the Court developed

> a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).

Dr. Chabreck testified: he had *not* published any articles on boat-induced waves causing vegetative mat loss; he did *not* *know of any* scientific study that would support his theory; he had *not* tested his theory in this, or any other marsh; and, although it is possible to measure the force and volume of water moving through the gaps, he had *not* done so.

Because the theory has *not* been published, or even tested, it could *not* possibly have been subject to peer review; there is *no* known error rate; and it *cannot* be generally accepted in the scientific community. Accordingly, because this testimony does

*not meet any of the* **Daubert** factors, the district court abused its discretion in admitting it.

Dr. Chabreck's testimony was the St. Martins' only causation evidence; without it, the district court could *not* find that waves entering the marsh through the spoil bank gaps caused the damage. This is especially so in the light of the testimony presented by the hydrologist called by Appellants: the force of the waves on reaching the vegetative mat was so small that "a normal afternoon wind would exert more force".

B.

But, even if the testimony was admissible, there is *no* duty on the part of Appellants to maintain the spoil banks. One servitude agreement states:

> NOW, THEREFORE, in consideration of the enhancement in value of Grantor's above-described lands in the event that a well or wells are drilled thereon, Grantor does hereby convey to Superior, its successors and assigns, the right and servitude to *dredge, construct, maintain and use a canal* having a width of 65 feet.... *Grantee is also given the right to deposit spoils within a distance of 150 feet on each side of the banks of the canal, but shall do so in such manner as to cause as little interference as possible to drainage....*
>
> This grant is for the purpose of affording access to the above described lands....

(Emphasis added.) (The other servitude agreement differs only in the property description.)

30

The servitude agreement imposes a duty to *maintain the canals*, which are limited to a width of 65 feet.  Spoil is the matter dredged to create a canal.  The agreement authorizes depositing spoil within 150 feet on each side of the canals' banks.  Restated, the spoil may be deposited away from the bank of a canal, so long as it is *not* deposited more than 150 feet from it.  The agreement does *not* provide for Appellants to *maintain the spoil banks*.  In short, the spoil banks are simply *not* part of the canals.

The plain language of the agreement does *not* require Appellants to construct and maintain a levee system.  (The St. Martins want even more than that; they want the canals *bulkheaded*.)  The servitude agreement prevents such construction, because it authorizes a canal 65 feet wide, defines its centerline, and does *not* grant additional land on which to construct a levee.

Moreover, the agreement requires that the spoil banks interfere as little as possible with drainage.  It is well to remember that the property was a marsh prior to dredging the canals.  Constructing a levee system would isolate the marsh and *block* drainage.  In other words, constructing levees is *not* interfering as "little ... as possible [with] drainage", as mandated by the servitude agreement:  it is just the opposite.

31

Moreover, to "maintain" is defined as "[t]o care for (property) for purposes of operation productivity". BLACK'S LAW DICTIONARY 965 (7th ed. 1999). To "maintain a canal", a man-made waterway used operationally for access to wells drilled on the property, is to keep it navigable. That is a far cry from maintaining spoil banks created as a result of dredging the canals.

In short, the servitude agreement does *not* explicitly require Appellants to maintain the spoil banks. But, the district court found an implied obligation for them to do so, in the light of the requirement to maintain the canals. Without explaining why, the majority agrees with this construction.

As discussed, this obligation is *not* in the agreement's plain language and does *not* comport with the dictionary definition of "maintain". In the alternative, for "interpreting controversial clauses in a contract[,] the court is guided by the interpretation the parties themselves placed upon the agreement and their understanding of it as shown by their actions. Thus, the conduct of the parties is relevant in determining their common intent". *Cashio v. Shoriak*, 481 So. 2d 1013, 1016 (La. 1986) (citations omitted).

The canals were created in 1965. Southdown did *not* demand that Superior, or its assignee Mobil, maintain the spoil banks. The gaps were present in the 1973 aerial photograph of the

property. Over 25 years after the canals were dredged, and approximately 20 years after evidence of gaps being present, the St. Martins requested that the spoil banks be maintained. Obviously, the course of conduct by the original parties, Southdown and Superior, demonstrates that they certainly did *not* intend for the spoil banks to be maintained. *Cf.* **id.** (over seven-year period of parties' acquiescence in political yard signs indicates they did *not* intend to proscribe such signs, even though plain language would have barred them).

### III.

For the foregoing reasons, the district court abused its discretion in admitting Dr. Chabreck's testimony and reversibly erred in concluding that, under the servitude agreement, there is an implied obligation to maintain the spoil banks. Accordingly, I respectfully dissent.