UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-30217
_____

IN THE MATTER OF: JLH, L.L.C.,

Debtor.

CREDIT AGRICOLE INDOSUEZ, IN ITS CAPACITY AS AGENT ON BEHALF OF THE
LENDERS: HIBERNIA CORPORATION, CREDIT AGRICOLE INDOSUEZ, FIRST
SOURCE FINANCIAL L.L.P., PILGRIM PRIME RATE TRUST, ML CLO XII
PILGRIM AMERICA (CAYMAN) LTD., GENERAL ELECTRIC CAPITAL CORPORATION
AND IBJ WHITEHALL BANK & TRUST COMPANY,

Appellant,

versus

JLH, L.L.C.,

Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
Civil Docket #99-CV-3566-G
_____

November 10, 2000

Before POLITZ, JONES, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

At issue in this case is the interpretation of an
agreement reached in the bankruptcies of two companies. Because
the agreement unambiguously required Credit Agricole Indosuez, as
agent, to pay $5,050,000 to JLH, and there were no substantial

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

deficiencies in the process of the bankruptcy court, we affirm the bankruptcy and district court judgments.

## FACTS

JLH is a Louisiana limited liability company that owns and develops real estate. It leased several grocery store properties to SGSM Acquisition Co. ("SGSM"). The grocery store leases secured SGSM's loans. Credit Agricole Indosuez is the agent for SGSM's creditors.

In February 1999, SGSM negotiated an asset purchase agreement ("APA") to sell six leases for $62 million to the SuperFresh/Sav-A-Center, Inc. ("A&P"). JLH was the lessor in four of these leases. The APA required consents of all the lessors as a condition of closing.

In March 1999, SGSM filed a Chapter 11 reorganization case in Delaware. JLH filed its own Chapter 11 bankruptcy case several days later.

In March and April 1999, SGSM and A&P signed the first and second amendments of the APA. These amendments referenced and added terms to the original APA. The second amendment included the following clause:

> Section 5. <u>Continued Effectiveness.</u> Except as expressly amended hereby, the Purchase Agreement shall continue in full force and effect.

In April 1999, SGSM and JLH reached a tentative settlement of various disagreements under which JLH would receive $ 1 million for its consent to the APA. Shortly thereafter, JLH

asserted that it was unaware that A&P intended to alter the stores. JLH renewed its objections to the lease transfers. At this point, Credit Agricole stepped in and offered an additional $ 4.05 million of the sale proceeds to obtain JLH's consent. Credit Agricole and JLH agreed to terms on June 16. The following are excerpted provisions from the agreement:

Section 1. <u>Definitions</u>:

"<u>Asset Purchase Agreement</u>" shall mean that certain Asset Purchase Agreement between Super Fresh/Sav-A-Center, Inc. and [SGSM] dated as of February 26, 1999, as amended prior to the date hereof and as in effect on the date hereof attached as Exhibit D hereto.

Section 3. <u>Agreements of [Credit Agricole]</u>:

(a) [Credit Agricole] shall cause in the aggregate $5,050,000 of the proceeds actually received by [Credit Agricole] pursuant to and in accordance with the Asset Purchase Agreement to be distributed to JLH (it being understood and agreed that said $5,050,000 includes the $1,000,000 to be distributed to JLH pursuant to the A & P Sale Order).

Section 5. <u>Miscellaneous</u>:

(b) <u>Interpretation.</u> Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the JLH or [Credit Agricole].

(d) <u>Amendments: Waivers.</u> Except as expressly provided herein, no term or provision hereof or schedule or annex hereto shall be amended, supplemented or otherwise modified, except pursuant to a written instrument signed by each of the parties hereto.

The bankruptcy court presiding over JLH's Chapter 11 proceedings in Louisiana approved the June 16 agreement.

Following this agreement, a dispute arose between the parties to the APA over taxes and inventory. As a result, SGSM and

3

A&P signed the third amendment to the APA on July 15. This amendment referred to the original APA and reduced the purchase price of the leases from $ 62 million to $ 56.9 million.

On July 28, JLH's attorneys wrote counsel for Credit Agricole to confirm that JLH would still receive $ 5.05 million. In an August 3 letter, Credit Agricole's attorneys expressed their disappointment that the president of JLH had not consented to a pro rata reduction of the $ 5.05 million in light of the new purchase price. JLH responded on August 6 that it was still entitled to the entire $ 5.05 million.

Despite this dispute, JLH fulfilled its obligations under the June 16 agreement to facilitate the closing in September. After the closing, Credit Agricole issued only $ 1 million of the sale proceeds to JLH.

JLH then filed a motion in the bankruptcy court in Louisiana to enforce that court's order approving the June 16 agreement. The bankruptcy court found that the June 16 agreement was not ambiguous and issued an enforcement order in September 1999 requiring Credit Agricole to pay JLH $ 4.05 million.

The district court affirmed the enforcement order in January 2000. It observed that the June 16 agreement attached the then-current APA as an exhibit. The court reasoned that in light of the "Amendments: Waivers" clause in § 5(d), the parties could not alter their obligations without a formal amendment substituting a new APA. The court further ruled that the third amendment did

4

not materially change or supersede the APA as it existed on June 16.

Credit Agricole now brings this appeal, challenging the courts' interpretation of the agreement and the procedures used by the bankruptcy court.

## DISCUSSION

We review the bankruptcy court's interpretation of the contract de novo, using the same criteria as that court. *See St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 409 (5th Cir. 2000). New York law applies to this agreement.

Credit Agricole argues that the closing of the APA as it existed on June 16 was a condition precedent to its duty to pay the remaining $4.05 million. It notes that the June 16 agreement defines the APA "as amended prior to the date hereof and in effect on the date hereof attached as Exhibit D hereto." Credit Agricole also argues that the June 16 agreement only required Credit Agricole to pay money from "the proceeds actually received . . . pursuant to and in accordance with the [APA]," as defined above. Under this interpretation, the third amendment materially altered the APA and the contract itself does not obligate Credit Agricole to pay JLH anything.

Credit Agricole argues that the § 5(d) requirement that any amendment be in writing supports this interpretation, since the parties did not agree to any modification encompassing the third

amendment to the APA. Credit Agricole also argues that only its interpretation makes economic sense, since it would not have contracted to pay JLH $ 4.05 million regardless of how small the purchase price might become.

JLH contends that the APA was a single agreement. As evidence, JLH points to the § 5 "Continued Effectiveness" clause of the APA. Under this interpretation, Credit Agricole did receive funds "pursuant to the [APA]." JLH fully complied with all the terms of the agreement even after the third amendment. It therefore reasons that Credit Agricole is still required to pay the $ 4.05 million.

JLH also points to § 5(d) "Amendments: Waivers" provision of the June 16 agreement. It argues that Credit Agricole could not duck its obligations without the written consent of both parties.

JLH argues that even if the June 16 agreement were ambiguous, the parties did not intend to condition their obligations on the APA closing in its precise form on June 16. In other words, JLH argues that it would not have contracted to allow any minor change in the APA to eliminate its right to payment.[1]

Contrary to Credit Agricole's view, the "actually received" language in § 3(a) is not a condition precedent to Credit

---

[1] JLH also argues that Credit Agricole should face judicial or equitable estoppel, since the bank did not renounce its obligation to pay the $4.05 million while JLH completed its duties at the September closing. Of course, JLH already had notice at this point of the dispute from its communications with Credit Agricole in July and August. We do not reach the estoppel issue.

6

Agricole's duty to pay under current New York law.  A condition precedent is "an act or event . . . [which] . . . must occur before a duty to perform a promise in the agreement arises." Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (N.Y. 1995).  "Conditions can be express or implied.  Express conditions are those agreed to and imposed by the parties themselves." Id. Implied or constructive conditions are those which courts impose to do justice. Id.  "Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." Id.

Express conditions are marked by unambiguous language. While they need not use the term "condition precedent," provisions that employ "the unmistakable language of condition ('if,' 'unless and until')" are express conditions. Id. (finding an express condition where a sublease was "null and void" "unless and until" plaintiff received landlord's consent); see also A.H.A. General Constr., Inc. v. New York City Hous. Auth., 699 N.E.2d 368, 370 (N.Y. 1998) (finding an express condition where plaintiff was required to file a claim to receive compensation and "upon failure [to comply], such claims shall be deemed waived").  Other language clearly demonstrating an intent to create a condition will also suffice.  See Hatzel & Buehler v. Lovisa Constr. Co., 1993 U.S. Dist. LEXIS 9899, at *5 (E.D.N.Y. 1993) (finding a condition precedent where the subcontractor agreed to be paid "only from

7

funds received by Contractor from Owner and that the intent of the parties is that Subcontractor assumes the credit risk incurred by the Contractor as respects payment by the owner").

In addition, New York courts construe pay-when-paid provisions like § 3(a) to establish only the time of payment unless the provision expressly conditions the duty to pay. "A contract provision stating that payment will occur upon a stipulated event will be construed as a time for payment provision unless there is express language to the contrary in the contract." West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co., 661 N.E. 2d 967, 970 (N.Y. 1995) (finding an express condition because the provision made payment from the third party a "condition precedent," but holding that such express conditions violated the New York Lien Law with respect to contractors). Schuler-Haas Elec. Co. v. Aetna Cas. & Sur. Co., 357 N.E.2d 1003 (N.Y. 1976) also exemplifies this rule of construction. In that case, the plaintiff's right to payment was subject to the contract between the owner and general contractor, and the plaintiff would receive payment when the owner made full payment. The New York Court of Appeals held that

> [i]f as here there is no express language to the contrary in the written document (and no extrinsic evidence), the standard would seem to be that where payment is stipulated to occur on an event, the occurrence of the event fixes only the time for payment; *it is not to be imported as a substantive condition of the legal responsibility to pay*.

Id. at 1003 (emphasis added).

8

The Court of Appeals has held that a contract provision similar to § 3(a) did not create a condition precedent. In Grossman Steel and Aluminum Co. v. Samson Window Corp., 426 N.E. 2d 176 (N.Y. 1981), the court held that a promise to pay a subcontractor "as and when [contractor receives] such payment from the [owner]" was not a condition precedent.[2]

Credit Agricole argues that this case resembles Mascioni v. Miller, 184 N.E. 473 (N.Y. 1933). The contractor-subcontractor agreement in that case provided for "[p]ayments to be made as received from the Owner." The Court of Appeals considered payment from the owner a condition precedent. Grossman, Schuler-Haas and West-Fair have supplanted this case.

Turning to § 3(a) of the June 16 agreement, there is no express language conditioning Credit Agricole's duty to pay.[3] Though "actually received . . . pursuant to and in accordance with the [APA]" implies that the duty is conditional, it is not express conditional language. Here there is no unmistakable language of condition such as "if" or "unless and until." The June 16 agreement does not state that it would be null and void if the APA

---

[2]    The text of the contract is in the decision below, Grossman Steel and Aluminum Co. v. Samson Window Corp., 78 A.D.2d 871, 871 (N.Y. App. Div. 1980).

[3]    "[When] determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition. This interpretive preference is especially strong when a finding of express condition would increase the risk of forfeiture by the obligee." Oppenheimer, 86 N.Y. 2d at 418.

9

did not close in its then-current form. Nowhere does JLH agree to accept the risk that the APA might close in a different form, or that it relies on the credit of A&P. The APA's closing in its form as of June 16 was not expressed as "a material part of the agreed exchange." See Oppenheimer & Co., Inc. v. Oppenheim, 660 N.E.2d 415, 418 (N.Y. 1995) (citing Restatements (Second) of Contracts § 229).

At least one Appellate Division court concurs. See Mass Transp. Elec. Constr. Corp. v. Penta Constr. Corp., 140 A.D. 2d 174, 176 (N.Y. Ct. App. 1988) (finding no condition precedent where the "Contractor's obligation to make payment to the Subcontractor shall be limited to funds actually received by the Contractor from the Owner . . ."). The language of § 3(a) could at best be a promise or constructive condition to Credit Agricole's duty to pay.

A New York court would not, however, constructively condition Credit Agricole's duty to pay on the APA's closing in its precise form as of June 16. It would only impose a constructive condition to promote justice. See Oppenheimer, 660 N.E. 2d at 418. It would construe the June 16 agreement to prevent JLH from forfeiting its right to payment due to circumstances beyond its control. See id. Here, JLH performed its obligations under the contract. Credit Agricole actually received money under an amended version of the APA. Therefore, there is no basis for enforcing a constructive condition, and Credit Agricole has an unconditional duty to pay JLH.

10

From the foregoing discussion, it should be clear that this agreement is not ambiguous. It specifies a concrete amount for JLH to receive and does not suggest that this figure would ever change without JLH's consent. It does not mention the original $62 million purchase price, and nowhere does it hint that what JLH receives is contingent on the final purchase price. While it might appeal to one's sense of fairness to reduce JLH's payment pro rata, nothing in the agreement would make this a reasonable interpretation of its terms.

Credit Agricole also challenges the bankruptcy court's procedure in entering an order to enforce the parties' settlement agreement rather than requiring the commencement of an adversary proceeding and a Rule 7056 summary judgment procedure. As JLH notes, however, the district court essentially cured any jurisdictional problem -- and superseded any bankruptcy procedural misstep, if there was one -- by ruling on the dispute de novo. Credit Agricole has neither asserted that any particular discovery was needed to develop the record nor explained exactly what it would have proved that is relevant to the interpretation of this unambiguous contract. In this case, any procedural difficulties are settled by the rule of no harm, no foul.

For the foregoing reasons, the judgments of the bankruptcy court and district court are AFFIRMED.