Heath William KNIGHT, et al Plaintiff

v.

KIRBY INLAND MARINE, INC.; Kirby Inland Marine, Inc. of Texas a/k/a Dixie Marine, Inc.; Hollywood Marine, Inc.; and Kirby Inland Marine, Inc. of Mississippi Defendants

No. CIV.A.4:01 CV 223–P–.

United States District Court,
N.D. Mississippi,
Greenville Division.

March 14, 2005.

Order Denying Reconsideration
March 30, 2005.

Daniel Marten Czamanske, Jr., Chapman, Lewis & Swan, Clarksdale, MS; John Hunter Stevens, Grenfell, Sledge & Stevens, Jackson, MS; and Mignon Angelette Gill, J. Robert Davis, Jr., J. Robert Davis, LLP, Houston, TX, for Plaintiff.

Frank John Dantone, Jr., Henderson Dantone, P.A., Greenville, MS, for Defendants.

## MEMORANDUM OPINION

PEPPER, District Judge.

This cause is before the Court on the defendants' Motion in Limine [51–1]. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows, to-wit:

## FACTUAL BACKGROUND

### I. Heath Knight

Heath Knight was born on January 18, 1974. He began working for Kirby Inland Marine in February 1993 at the age of nineteen. Knight initially worked on the M/V Dixie Voyage out of the Houston, Texas Harbor. After earning his license in September 1993, Knight worked as a tankerman until November 1994, a period of only twenty months.[1]

Knight maintained a transfer log during his tenure as a tankerman. His log lists forty-five barge transfers between September 28, 1993 through October 15, 1994.

Of the forty-five transfers listed in the log, only one barge contained a cargo of benzene; it was a closed transfer discharge in which the facility recovered the vapors. Of the remaining transfers, only six dealt with a naphtha transfer, two involved xylene and three were of a light aromatic chemical. In addition, Knight's log reveals three cargo transfers of vinyl acetate monomer, one of hot oil and a split cargo of vinyl acetate monomer and acrylonitrile. The remaining transfers involved either acrylonitrile or fertilizer.

Knight experienced only two acute exposures to chemicals during his time as a tankerman. The first occurred on November 10, 1993; Knight and two other crew members were sprayed with naphtha while Knight was removing a header line following a cargo transfer. He was wearing his personal protection equipment, including a full face respirator, at the time. The other incident occurred on August 4, 1994; Knight lifted a spill valve on a loaded acrylonitrile barge and the product sprayed onto Knight's logs. Knight did not seek medical treatment in connection with either of these exposures; his employer has no record of the incidents.

Beyond the acute exposures, Knight also smelled chemicals or vapors on the barges. He experienced some exposure to chemicals while priming pumps, working around leaking glands and valves and in close proximity to leaks at the discharge fittings on pumps. Knight learned he had Hodgkin's lymphoma in August 1998. He underwent surgery, chemotherapy and radiation. His recovery was good and he has been in remission since 1998. Knight's primary physician opined that Knight is cancer free and it is unlikely that the cancer will recur.

---

1. Knight became a crew dispatcher in November, 1994 and worked in that capacity under February 1998. He alleges no chemical exposure during his employment as a dispatcher.

## II. Thomas Ingerman

Thomas Ingerman was born on December 30, 1957. After graduating from high school, he worked for a brake shop for about nine months.[2] Ingerman entered the marine industry as an oiler and rigger for Brown & Root in 1978. As a oiler, he worked around diesel engines and small gasoline engines. As a rigger, he used a large crane to lay platforms. Approximately four years later, Ingerman went to work for Zapata as a rigger assisting drillers of oil and gas exploration holes. Ingerman left Zapata after a year and went to work for Redding and Bates, another offshore company.

Some time later, Ingerman began working as a deckhand for Arthur Smith Corporation, during which time he earned his tankerman's license. After a year with Arthur Smith, Ingerman began working as a tankerman for Hollywood Marine; two years later he received a promotion to "Top Gun" tankerman, an appellation which denotes the "best of the best" tankermen. Ingerman continued to work for Hollywood in that capacity until March 1995 when he accepted a position as dispatcher with Hollywood Marine.

Ingerman recalled six instances of acute exposure to chemicals while working on barges. The first occurred in 1987 while he worked for Arthur Smith.[3] A dockman failed to shut down a cargo transfer; as a result, xylene sprayed on Ingerman.

The remaining incidents occurred during Ingerman's employment with Hollywood Marine. On one occasion, a "quick connect" valve came apart, spraying Ingerman with benzene. He went to the hospital; hospital personnel removed his clothing, placed him in a shower, washed his eyes out and discharged him. Although he missed a few days of work as a result of the incident, Ingerman fully recovered and returned to work with no apparent problem. On another occasion, a pump seal failed on a xylene barge. Ingerman simply washed the product off; he did not seek treatment at a hospital because he had no symptoms. Another exposure occurred when a pump seal blew during the discharge of acetone cyanohydrin; the product sprayed onto Ingerman. He sought no medical attention for the exposure. Ingerman also breathed in some acrylonitrile vapor when a valve blew during the discharge of a barge; he did not come in contact with the product. Another incident resulted in burns to Ingerman's skin and eye irritation; the hospital treated him and he missed a few days of work; Ingerman could not recollect the product. Finally, Ingerman's personnel file reported an exposure to pyrolysis gas; he underwent a phenol test for benzene exposure. The test results were negative.

During the period Ingerman worked for Hollywood, he underwent annual benzene physicals and annual refitting for his personal protection equipment. None of his annual benzene physicals revealed any abnormality or buildup of benzene or any other hazardous chemical.

Ingerman began smoking in 1976 at age nineteen. He smoked continuously from 1976 to 1992. He began smoking again in 1994 and continued to do so until November, 1999 when he was diagnosed with bladder cancer. Some two years prior to his diagnosis, Ingerman suffered from a persistent bladder infection.

### LEGAL ANALYSIS

Defendants urge that the plaintiff's expert, Dr. Barry S. Levy, should not be

---

**2.** He later learned that the brake shoes with which he worked contained asbestos, but he never filed any type of claim.

**3.** The Arthur Smith Corporation has no connection with Hollywood Marine or Kirby.

permitted to testify because his testimony does not meet the requirements of Federal Rule of Evidence 702.

## I. *Daubert* Standard

It is the duty of the trial judge to screen a proffered expert's testimony to determine admissibility. F.R.E. 104(a).[4] *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

As a first step, the Court should examine a witness' qualifications to determine whether he or she is, in fact, "qualified as an expert by knowledge, skill, experience, training, or education ...." F.R.E. 702. A trial judge should refuse to allow an expert witness to testify if the witness is not qualified to testify in a particular field or on a given subject. *St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 412 (5th Cir.2000).

Assuming a witness is sufficiently qualified, the Court must evaluate the proposed testimony. In doing so, the Court seeks to ensure that the expert's testimony is not only relevant, but reliable as well. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir.1997). In determining relevance, the Court considers whether "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(quoting from *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).[5]

Furthermore, expert testimony is admissible only when "1) the testimony is based on sufficient facts or data; 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case." F.R.E. 702. The inquiry is both fact intensive and flexible. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *See also Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. The end objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme court delineated certain factors to assist courts in evaluating the foundation of a given expert's testimony, though the Court carefully emphasized the nonexhaustive nature of the listing. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. *Daubert* suggested that a trial judge consider: 1) whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation. *United States v. Paul*, 175 F.3d 906, 910 n. 4 (1999).

With all the foregoing in mind, the Court shoulders its gate-keeping responsibility.

## II. Dr. Levy's Testimony

Plaintiffs contend that their exposure to chemicals while working as tankermen for

---

4. "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court ...." F.R.E. 104(a).

5. "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702–18.

---

Hollywood Marine, Kirby's predecessor in interest, caused Knight's Hodgkin's lymphoma and Ingerman's bladder cancer. Plaintiffs hired Dr. Barry S. Levy, an epidemiologist, to provide expert testimony with regard to both general causation and specific causation of the plaintiffs' respective illnesses.

## A. Dr. Levy Possesses the Necessary Qualifications

Dr. Levy obtained his B.S. degree in liberal arts in 1966; he earned his M.D. degree in 1971. He holds a certification from the American Board of Internal Medicine and the American Board of Preventive Medicine/Occupational Medicine. He began serving as an adjunct Professor for Tufts University School of Medicine's Department of Family Medicine and Community Health in 1993. In addition to his position at Tufts, Dr. Levy provides consulting services, including but not limited to service as an expert witness in environmental and occupational health areas. He is the author of numerous articles pertaining to environmental and occupational health.

Reference to Dr. Levy's curriculum vitae and a brief review of his hearing testimony satisfy the Court that Dr. Levy is a highly qualified epidemiologist and physician. Though the defendants attempted to raise some questions regarding Dr. Levy's limited knowledge of disease mechanisms, the Court is satisfied that Dr. Levy possesses the necessary credentials to testify in this matter.

## B. Dr. Levy's Proposed Testimony is Unreliable

### 1. Methodology for General Causation Opinion [6]

Dr. Levy described a three-part methodology. He first attempted to identify the relevant medical and scientific literature pertinent to causation of both Hodgkin's lymphoma and bladder cancer. He then reviewed each study to assess the methods employed, data collection and analysis, and the authors' conclusions. Finally, Dr. Levy undertook the task of analyzing the entire body of literature in order to arrive at an opinion as to general causation based on the application of certain well-recognized principles known as the Bradford–Hill standards. The Reference Manual on Scientific Evidence delineates those factors as:

1. temporal relationship;
2. strength of the association;
3. dose-response relationship
4. replication of the findings;
5. biological plausibility (coherence with existing knowledge);
6. consideration of alternative explanations;
7. cessation of exposure;
8. specificity of the association; and
9. consistency with other knowledge.

Michael D. Green, et al., "Reference Guide on Epidemiology," Federal Judicial Center, *Reference Manual on Scientific Evidence* at 375.

Taken in the abstract, Dr. Levy's methodology is unassailable. The methodology he described is accepted in the field of epidemiology and by courts.[7] It is equally

---

6. Given the Court's conclusion respecting Dr. Levy's general causation testimony, it is unnecessary for the Court to determine whether his specific causation testimony comports with the requirements of F.R.E. 702.

7. "The reliability of expert testimony founded on reasoning from epidemiological data is generally a fit subject for judicial notice; epidemiology is a well-established branch of science and medicine and epidemiological evidence has been accepted in numerous cases." *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 954 (3rd Cir.1990).

true, however, that epidemiology, unlike many other scientific fields, includes an inherently subjective element "epidemiology cannot objectively prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data." *Id.* at 374. The Bradford–Hill guidelines provide no failsafe measure of causation:

> There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal relationship exists. Similarly, the existence of some factors does not ensure that a causal relationship exists. Drawing causal inferences after finding an association and considering these factors requires judgment and searching analysis, based on biology, of why a factor or factors may be absent despite a causal relationship, and vice-versa. While the drawing of causal inferences is informed by scientific expertise, it is not a determination that is made by using scientific methodology.

*Id.* at 375. In the end, Dr. Levy's Bradford–Hill analysis is only as reliable as the underlying data upon which it is based. F.R.E. 703.

### 2. Hodgkin's Lymphoma

Dr. Levy's affidavit mentions some twenty-one articles as relevant to the issue of whether exposure to benzene causes Hodgkin's lymphoma. Upon closer questioning during the *Daubert* hearing, Dr. Levy admitted he did not rely on either the Brandt paper or one of the Persson papers because they were merely review articles rather than primary research; furthermore, Dr. Levy confessed he did not rely on the findings in the Boffetta, Wartenberg, Travier or the two Blair studies to support his causation opinion.

Among the remaining studies, neither the 1981 Hardell study nor the studies published by Moen and Pasqualetti provided relative risk data for Hodgkin's lymphoma; instead, the studies gave risk ratios for malignant lymphomas, cancer generally and for hematopoietic malignancies as a class. Four of the other studies (La.Vecchia, Persson, Nilsson, Saami) upon which Dr. Levy relied lacked statistical significance.[8] After careful consideration, the Court concludes that these epidemiologic studies cannot reasonably provide a foundation for Dr. Levy's opinion that benzene and other organic solvents cause Hodgkin's lymphoma.

The elimination of the above-referenced studies leaves only seven published studies as a possible basis of Dr. Levy's causation opinion. Two of those studies, the 1983 Hardell study and the Olsson study, are case-control studies.[9] The Olsson study reported an increased relative risk of Hodgkin's lymphoma for individuals exposed to a broad class of organic solvents. Notably, it includes a number of solvents classified as probable carcinogens which Knight never worked around.[10] The study also listed chemicals to which Knight was exposed, e.g. styrene, a substance which Dr. Levy does not contend to be carcinogenic to humans. The Hardell study suf-

---

**8.** The Saarni study also failed to provide a risk factor for Hodgkin's disease apart from other lymphomas and myelomas.

**9.** Case-control studies identify individuals with a particular disease (cases) and match them with a control group without the disease. The researcher then performs a comparison of past exposures. Where a particular exposure is associated with or cause a disease, one should expect a higher proportion of past exposure among cases than among the controls.

**10.** These include trichloroethylene and perchloroethylene. .

fers from the same deficiency; it lumps numerous high-grade solvents together.

The other studies cited by Dr. Levy are cohort studies.[11] Dr. Levy identified these as the Thomas, Garland, Vianna, Olin and Greene papers. Though each of the studies reported an increased relative risk of Hodgkin's disease in the cohorts studied, none of the studies isolated particular exposures.[12] A related deficiency is the lack of documentation of the level of exposure for any of the cohorts at issue.

### 3. Bladder Cancer

Dr. Levy's affidavit mentions thirty articles as relevant to the issue of whether exposure to benzene causes bladder cancer. However, the Moen study provided no relative risk data for Hodgkin's lymphoma; instead, the study gave a risk ratio for cancer generally. Twelve of the other studies (the 2002 Zheng study, Zeegers, Coggon, Bulbuyan, Siemiatycki, Claude, Steineck, Kunze, Teschke, Zahm, La Vecc-

hia and Vineis) upon which Dr. Levy relied lacked statistical significance. After careful consideration, the Court concludes that these epidemiologic studies cannot reasonably provide a foundation for Dr. Levy's opinion that benzene, other organic solvents and/or diesel exhaust cause bladder cancer.

The elimination of the above-referenced studies leaves eighteen published studies as a possible basis of Dr. Levy's causation opinion. Ten of those studies are case-control studies (Carel, Risch, Schoenberg, Mommsen, Cordier, Kabat, Smith, Hoar and the two Silverman studies). These studies suffer from the same flaws as the Hodgkin's lymphoma studies-they identify only a broad category of exposures, all of which are include chemicals to which Ingerman was never exposed. The studies cannot reasonably be relied upon to derive a general causation opinion with regard to of the substances to which Mr. Ingerman was actually exposed. Furthermore, to

11. Cohort studies involve the identification of two groups of individuals: 1) individuals exposed to a substance that is considered a possible cause of disease; and 2) individuals who have not been exposed. The study takes place of a specified period; researchers determine the proportion of individuals in each group who develop the disease of interest. Where a particular agent causes the disease, one should expect a higher proportion of exposed individuals to develop the disease as compared to those who had no exposure.

12. The Thomas study of oil refinery workers characterized the nature of the employees' work as "separating crude oil into various components including fuels, petroleum solvents, lubricating oils, petroleum wax, greases and other products." Ex. 7 to Dr. Levy's deposition. The study concluded: "More definitive studies are needed to estimate cancer risks in the petroleum industry and to identify exposures that are carcinogenic." The Garland study identified machinist's mates as having exposure "to a variety of volatile industrial solvents, cutting and lubricating oils, metal dusts and vapours, and freon." Exhibit

8 to Dr. Levy's deposition. The Vianna study merely identified "benzene-related occupations." Exhibit 11 to Dr. Levy's deposition. Olin's study merely posits that the documented high cancer mortality of chemists is probably due to "the exposure to chemical substances in their educational or occupational environment." The study expressly noted: "One of the problems in the interpretation of results from a study like the present one ... is the lack of knowledge about the kind of exposure in the cohort." Exhibit 84 to Dr. Levy's deposition. The study of printing plant workers published by Greene recognized exposure to a "panoply of potentially toxic substances, including pigments, inks, solvents, resins, driers, plasticizers, and wetting agents." Greene observed: "Thus, our findings are consistent with other epidemiologic and experimental studies suggesting that printers are at higher risk for certain cancers, but need clarification by carefully designed cohort studies of selected occupations in the printing trade, in which the specific exposures can be characterized." Exhibit 85 to Dr. Levy's deposition.

the extent that any of the studies do suggest association with a particular exposure, e.g., diesel exhaust, data pertaining to the subjects' exposure levels is unavailable. Assuming that a particular agent plays a causative role in bladder cancer, the studies afford no reliable information with regard to how much exposure is necessary to produce harm.

The Chen and Yamaguchi studies are meta-analyses.[13] The studies suggest a heightened relative risk of bladder cancer for those employed in certain industries. Again, the studies classify workers broadly and fail to provide specific exposure data.

The other studies cited by Dr. Levy are cohort studies, e.g., the Steenland, Brown, Pfluger, Soll–Johanning and 1992 Zheng studies. Though each of the studies reported an increased relative risk of bladder cancer for certain cohorts, none of the studies isolated particular exposures.[14] A related deficiency is the lack of documentation of the level of exposure for any of the cohorts at issue.

### 4. Application of *Daubert* Criteria

■ While the Court recognizes Dr. Levy's expertise in this field, the Court is constrained to find that his proposed testimony regarding general causation lacks the necessary foundation to withstand *Daubert* scrutiny. His theory of causation is not generally accepted. No peer-reviewed epidemiological study nor any published review of such studies has concluded that the specific chemicals at issue in this case are known-or even probable-causes of the plaintiffs' cancers. Dr. Levy relied on a variety of relatively dissimilar epidemiological studies to conclude that specific chemicals cause specific cancers. Most of the studies Dr. Levy cited failed to identify specific chemical exposures, involved potential exposure to chemicals not at issue in this matter, or inferred exposure by job category rather than by direct measurement. *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 198 (5th Cir.1996)("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.").

Dr. Levy's theory is not subject to testing; it is impossible to quantify a potential rate of error, and the only standards which seem to govern Dr. Levy's findings are based on his admittedly learned say-so.[15] This is precisely the kind of testimony

13. Metanalysis pools the results of multiple studies to arrive at a single figure representative of all of the studies reviewed. It is of limited value in combining the results of epidemiologic studies based on observation.

14. The 1992 Zheng study found an elevated risk of bladder cancer in petroleum refining workers and organic chemical production workers. However, the study noted "the analysis was limited to occupation and industry titles, with no direct information on exposure agents." Exhibit 67 to Dr. Levy's deposition. The Steenland study made a similar observation regarding painters: "The main weaknesses in our data are the lack of detailed work history and the lack of any specific exposure information; the agents responsi-

ble for the cancer excesses found here are unknown." Exhibit 71 to Dr. Levy's deposition. The authors of the Brown study observed the same deficiency: "Limitations of this study include ... lack of knowledge about specific job exposures." Exhibit 72 to Dr. Levy's deposition.

15. Dr. Levy's basis for identifying pertinent risk data and occupational categories is indicative of subjectivity; the only rationale he identified for his decision to include data in one instance and to exclude it in another was the explanation that he cited findings various authors considered "significant;" while at the same time assuring the Court that he considered all of the data in each study.

*Daubert* was intended to avoid. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Court can, and does, "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## CONCLUSION

Based on the foregoing facts and analysis, the Court concludes that the defendants' Motion in Limine [51–1] is well-taken and should be granted. An Order will issue accordingly.

## *ORDER*

This cause is before the Court on the plaintiff's Motion to Reconsider [92–1]. The Court, having reviewed the motion and being otherwise fully advised in the premises, finds as follows, to-wit:

That the motion is not well-taken and should be denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the plaintiff's Motion to Reconsider [92–1] is not well-taken and should be, and hereby is, DENIED.